693 A.2d 1

Dona K. BRESNAHAN

v.

William B. BRESNAHAN.

No. 1212 Sept.Term 1996.

Court of Special Appeals of Maryland.

April 2, 1997.

Motion for Reconsideration Denied on May 27, 1997.

Thomas F. DeCaro, Jr., Upper Marlboro, for Appellant.

Mitchell I. Alkon (Pasternak & Fidis, P.A., on the brief), Bethesda, for Appellee.

Argued before CATHELL, HARRELL and THIEME, JJ.

CATHELL, Judge.

Dona K. Bresnahan appeals from a jury verdict and subsequent court judgments rendered in the Circuit Court for Prince George's County. William B. Bresnahan, appellee, cross appeals from other aspects of the jury verdict and from the trial court's denial of his motion for judgment notwithstanding the verdict.

Appellant presents five issues:

■ Whether proof of actual malice is a prerequisite to an award of punitive damages in a partnership dissolution case where the jury found that [appellee] breached his fiduciary duty to the estate of his deceased partner.

■ Whether the trial should have been bifurcated to allow [appellant] to present evidence of [appellee's] net worth in connection with the submission to the jury of [appellant's] claim for punitive damages against [appellee].

■ Whether the evidence, consisting of [appellant's] testimony concerning the amount of attorneys' fees incurred in this case, is sufficient to support [appellant's] demand for attorneys' fees in the absence of expert testimony that the fees incurred were "reasonable."

■ Whether the trial court properly set aside the jury verdict awarding [appellant] the profits earned by the [appellee] from the partnership after the death of the decedent.

■ Whether the trial court properly allowed the deed to the partnership real estate to be released to [appellee] prior to the conclusion of these proceedings.

The first two issues are intertwined, and we shall address them together. We shall address the other issues separately. Appellee, in his cross-appeal, presents a two-part question:

Did the trial court err in entering judgment for [appellant] for deposition costs and appraisal fees, and in failing to grant [appellee's] motion for judgment notwithstanding the verdict in this respect?

## The Facts

Both parties in their briefs expound upon their allegations that the actions of the other were bizarre. There are allegations that one of the parties placed dead bats in condoms and rooster heads in boxes and deposited them on the other's property and allegations that the other party stated, "Hitler lived in the center of the earth," and made references to "space aliens," construction of space ships, "vision quests," etc., most of which, in regard to this appeal, are completely irrelevant. We will not insert ourselves in the parties' vindictiveness. We shall attempt a judicious and restrained recitation of the facts.

Appellee and Daniel Bresnahan were equal partners in a "crab house" operated as a general partnership. Daniel Bresnahan died, and appellant, his widow, became the personal representative of his estate. Attempts were made by both parties to arrive at a settlement in regard to the estate's interest in the partnership and a winding up of the partnership. These attempts, to the extent that the parties participated, were rancorous and ultimately unsuccessful.

Eventually, appellant instituted suit against appellee. The case proceeded to trial on appellant's First Amended Complaint. It provided, after a factual recitation, that:

15. All allegations in Paragraphs 1 through 14 are realleged and incorporated herein by this reference as if fully set forth herein.

16. The improper actions of [appellee] herein constitute a breach of the fiduciary duty owed by [appellee] to [appellant] and to the Partnership, which duty is owed to these parties by [appellee] insofar as [appellee] is the sole remaining Partner of the Partnership.

WHEREFORE [appellant], on behalf of the estate, on her own behalf and on behalf of the Partnership prays for (1) Distribution to [appellant] of $62,500, representing one-half of the value of the interest in the Partnership owned by Decedent Daniel Bresnahan as of the date of death, net of amounts received heretofore by [appellant], plus undistributed Partnership profit of $6,000 accrued in 1991; (2) Distri-

bution to [appellant] of one-half of the partnership profits earned between November 1, 1991 and the date on which [appellee] deposited the final installment of the Partnership value into the registry of this Court; (3) [Appellant's] attorneys' fees and related costs in maintaining this action and in attempting, in connection with ... the filing of this case, to recover the value of the Partnership from [appellee], consisting of appraisal fees of $15,960, deposition costs of $550.30, and legal fees of approximately $50,000; (4) Punitive damages, in an amount to be determined by the jury in this matter, for breach of [appellee's] fiduciary duty in this matter.[1]

The case was tried on this amended complaint, and a special verdict form was used. The parties do not direct us to any place in the record where either of them objected to the special verdict form used. At one point, the trial court stated:

I've constructed the verdict sheet in the fashion that I have in order to preserve, or at least to make clear, preserve certain issues if there is an appeal, so that whatever would happen on appeal would not require the parties to exhaust resources again trying the case a second time.

That's my real purpose in constructing a verdict sheet, because it's not going to be ... to anyone's benefit, least of all mine, if the parties have to try this case again.

The verdict sheet, as answered by the jury, provided:

---

1. In August of 1996, well after judgment was rendered in the case *sub judice*, this Court, for the first time, recognized the independent tort of breach of fiduciary duty in *Hartlove v. Maryland Sch. for the Blind*, 111 Md.App. 310, 681 A.2d 584 (1996), *vacated and remanded for reconsideration*, 344 Md. 720, 690 A.2d 526 (1997). Accordingly, at the time of the verdict, the independent tort had not yet been recognized. By failing to incorporate any part of her previous complaint in her amended complaint, appellant prosecuted an action that had not yet been recognized. Appellee did not raise the nonexistence of this cause of action before the trial court and has not raised it before us. Accordingly, that issue is waived, and we need not resolve whether *Hartlove's* application would apply to causes of action already litigated to judgment prior to *Hartlove's* filing. Moreover, the Court of Appeals in *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509 (1997), has "disapproved" *Hartlove*.

*VERDICT SHEET*

1. Did [appellee] breach a fiduciary duty owed to [appellant]?

Yes __x__ No _____

IF YOUR ANSWER TO QUESTION # 1 IS "NO," STOP AND GO NO FURTHER.

2. What damages, if any, proximately caused by [appellee's] breach, do you award [appellant]?

| Deposition Fees | $ 900.00 |
| Appraisal Fees | $ 7,500.00 |
| Profits | 62,500.00 for ½ business |

3. Do you find, by clear and convincing evidence, that [appellee] acted with actual malice?

Yes _____ No __x____

IF YOUR ANSWER TO QUESTION # 3 IS "NO," STOP AND GO NO FURTHER.

4. What damages, if any, do you award as punitive damages?

$_____

Appellant's first issue is:

1. Whether proof of actual malice is a prerequisite to an award of punitive damages in a partnership dissolution case where the jury found that [appellee] breached his fiduciary duty to the estate of his deceased partner.

Appellant extends the impact of, and relies heavily on *Hartlove v. Maryland Sch. for the Blind,* 111 Md.App. 310, 681 A.2d 584 (1996), *vacated and remanded for reconsideration,* 344 Md. 720, 690 A.2d 526 (1997), for the proposition that *Hartlove* adopts in full section 874 of the Restatement (Second) of Torts, which provides that, in breach of fiduciary duty actions, the breach alone is sufficient to provide a basis for an award of punitive damages. Thus, according to appellant, the trial judge's instruction to the jury that it had to find actual malice in order to award punitive damages was wrong.

An initial concern is that, at the time of the verdict in this case, the tortious cause of action upon which appellant relied

and prevailed, had not yet been recognized in Maryland. Even if it had been recognized, *Hartlove*, as appellant admits, did not explicitly adopt that aspect of the Restatement's provision as to punitive damages. We shall, however, leave the interesting and difficult question of the *ex post* application of *Hartlove*'s holdings to another case, as we shall decline to extend *Hartlove*, to the extent it may still exist after *Kann*, to any degree beyond its limits as we perceive them.

We initially note that the only count that survived at the time this case was submitted to the jury was the single, separate count of breach of fiduciary duty. Appellant's count of fraud had been disposed of either by motion or voluntarily, by amending it out of the cause of action. Moreover, appellant has not appealed any decision of the trial court that may have resulted in the fraud count being eliminated from the suit. We are, therefore, faced with a situation in which fraud has not been established and the only cause submitted to the jury was an independent count alleging a breach of fiduciary duty.

On December 20, 1996, the Court of Appeals denied certiorari in *Hartlove*. On March 7, 1997, it ordered its December 20, 1996, order to be rescinded and recalled, and finally, on March 12, 1997, the Court of Appeals granted certiorari (Pet.Doc. No. 488/96) on the petition for certiorari, denied the cross-petition for certiorari, ordered our opinion to be vacated, and remanded *Hartlove* to this Court for reconsideration in light of its opinion in *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997).

The Court of Appeals in *Kann* discussed *Hartlove*, noting the *Hartlovee* majority's holdings:

First, it said: "Given the standard of conduct imposed upon fiduciaries, we are of the view that fiduciaries who breach their duty should be held accountable under an independent cause of action aimed at such conduct." [*Hartlove*, 111 Md.App. at 331, 681 A.2d 584] (footnote omitted). The panel of the Court of Special Appeals divided two to one on this first holding.

*Kann,* at 708–709, 690 A.2d 509. In respect to this holding, the Court of Appeals commented:

Regina [Kann] and the Court of Special Appeals read too much into § 874 of the Restatement. As we saw in Part III.A, § 874 in effect recognizes the universal proposition that a breach of fiduciary duty is a civil wrong, but the remedy is not the same for any breach by every type of fiduciary. For some breaches the remedy may be at law, for others it may be exclusively in equity, and for still others there may be concurrent remedies.

*Id.* at 710, 690 A.2d 509. It further commented:

Under the tort that Regina seeks, if Donald [Kann] breached the trust, he would be liable for damages for "stress, mental anguish and exacerbation of various physical ailments and conditions directly resulting from Donald's actions." Brief of Appellant at 17–18. It is not at all clear that Regina would limit damages for emotional distress to cases in which the trustee has caused some economic loss to the beneficiary. Given the fact that Regina does not challenge for lack of evidence the trial court's finding that Louis misappropriated assets of the Frances Trust, Regina's arguments strongly suggest that she seeks emotional distress damages if Donald made any misstep, even if it did not cause loss. Regina's quest for this new tort liability of trustees is particularly unpersuasive when one considers that there may be instances in which a trustee may commit a breach of trust mistakenly and non-negligently. *See* Restatement (Second) of Trusts § 201 cmt. a.

Regina's requested tort would also carry the potential for punitive damages. But punitive damages are not at all available in equity. . . .

In overview, Regina asks this Court to make a very far reaching change in Maryland law by creating a tort that will apply to *all fiduciaries.* Neither Regina nor the Court of Special Appeals in *Hartlove* has undertaken to review all of the relationships to which the new tort would apply. There has been no analysis of whether, as to any given fiduciary

relationship, the tort would duplicate existing remedies at law or would eliminate, as in the case of trustees, the nearly complete exclusivity of equitable jurisdiction. There has been no analysis of the effect of the new tort on the probate area. Further, recognition of the new tort would make trustees, and any other fiduciaries whose breaches are currently primarily remediable in equity, subject to potential liability for punitive damages.

The instant matter differs radically from a number of this Court's decisions in which new causes of action have been recognized. By way of illustration, and not limitation, we have recognized a new cause of action when there was no existing legal remedy directed at the problem. In the instant matter we have not been presented with, nor are we aware of, any lack of adequacy of the existing remedies for breach of a trustee's duties. There is, in our view, no justification for the wholesale changes in Maryland law that Regina advocates. Indeed, so enduring has been the marriage between trusts and equity in this State that adoption of Regina's contentions would violate the spirit, if not the letter, of [Maryland Code, Estates & Trusts Article,] § 14–101 ("A court having equity jurisdiction has general superintending power with respect to trusts.").

Accordingly, we hold that there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem.

*Id.* at 711–713, 690 A.2d 509 (citations omitted).

The last three sentences above can be interpreted as a restatement of the law prior to *Hartlove, i.e.,* identify a fiduciary relationship, identify the breach, determine what causes of action are supported by the breach of fiduciary duty,

and select the cause of action that best serves the wronged party. The Court of Appeals went on to state:

> Counsel do not have available for use in any and all cases a unisex action, triable to a jury. This Court would not preside over the death of contract by recognizing as a tort a breach of contract that was found to be in bad faith. *See K & K Management, Inc. v. Lee,* 316 Md. 137, 557 A.2d 965 (1989). Nor shall we preside over the death of equity by adopting Regina's contentions.
>
> To the extent that *Hartlove v. Maryland School for the Blind,* 111 Md.App. 310, 681 A.2d 584 (1996), is contrary to the views expressed in this opinion, *Hartlove* is disapproved.

*Kann,* at 713, 690 A.2d 509 (citations omitted).

In light of *Kann,* it is doubtful that *Hartlove*'s creation of an independent tort of breach of fiduciary tort has survived. In the case *sub judice,* it was the only count submitted to the jury. It is very possible that, had appellee/cross-appellant presented the issue of the validity of the cause of action itself, we might have been required to reverse the entire verdict and decision in light of *Kann.*[2] However, the issue has not been preserved.[3] Accordingly, we shall address the issues presented as to punitive damages.

■ We agree with the statement in appellee's brief that "the Court of Appeals has conclusively determined that actual malice is a prerequisite to an award of punitive damages, although actual malice may be met by proving fraud." We now examine the cases. *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), is, as the parties indicate, the seminal case expressing Maryland's current view of punitive

---

2. Kann was filed after oral argument in the case at bar.

3. We reiterate that the other causes initially pled in the complaint did not survive, for whatever reason, to be submitted to the jury. Only the breach of fiduciary duty was submitted to the jury. In many ways, this case represents many of the problems discussed in the *Hartlove* dissent and in *Kann.*

damages. *Zenobia* was a products liability case in which the question of punitive damages was a major issue. We shall, in our consideration of it, go directly to the Court of Appeals's discussions about the role of punitive damages in Maryland tort law. At the very inception of the opinion, Judge Eldridge noted that the Court had issued its writ of certiorari to "consider several important questions ... and to reconsider some of the principles governing awards of punitive damages in tort cases." *Id.* at 427–28, 601 A.2d 633. The Court noted its order to the parties:

> [T]his Court issued an order requesting that the briefs and argument encompass the following issue:
>
>> In light of the concurring opinion of Judges Eldridge, Chasanow, and Cole in *Schaefer v. Miller,* 322 Md. 297, 312–332, 587 A.2d 491 (1991), what should be the correct standard under Maryland law for the allowance of punitive damages in negligence and products liability cases, *i.e.,* gross negligence, actual malice, or some other standard.

*Zenobia,* 325 Md. at 450, 601 A.2d 633.

It then discussed some of its reasons for requesting that the parties address that particular issue:

> As noted in the opinion of Judges Eldridge, Cole and Chasanow in *Schaefer v. Miller, supra,* 322 Md. at 312–332, 587 A.2d 491, in recent years there has been a proliferation of claims for punitive damages in tort cases, and awards of punitive damages have often been extremely high. See 2 J. Ghiardi and J. Kircher, *Punitive Damages Law and Practice* § 21.01, at 2 (1985); D. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products,* 49 U. Chi. L.Rev. 1, 6 (1982) ("Large assessments of punitive damages may not yet be a major threat to the continued viability of most manufacturing concerns, but the increasing number and size of such awards may fairly raise concern for the future stability of American industry")....
>
> Accompanying this increase in punitive damages claims, awards and amounts of awards, is renewed criticism of the

concept of punitive damages in a tort system designed primarily to compensate injured parties for harm.

*Zenobia,* 325 Md. at 450–51, 601 A.2d 633 (some citations omitted).

The Court then gave an advance summary of its holding in the case:

In Maryland the criticism has been partly fueled and justified because juries are provided with imprecise and uncertain characterizations of the type of conduct which will expose a defendant to a potential award of punitive damages. Accordingly, we shall (1) examine these characterizations of a defendant's conduct in light of the historic objectives of punitive damages, (2) more precisely define the nature of conduct potentially subject to a punitive damages award in non-intentional tort cases, and (3) heighten the standard of proof required of a plaintiff seeking an award of punitive damages.

*Id.* at 451, 601 A.2d 633. The *Zenobia* Court noted that we (and the trial court) had required the plaintiffs to show "by a preponderance of evidence that the defendants acted with 'implied' rather than 'actual' malice." *Id.* at 452, 601 A.2d 633. The Court discussed punitive damages arising out of contracts and then noted: "[W]e abandon the 'arising out of a contract' distinction 'and return to the principles relating to punitive damages which had prevailed in this State for many, many years before [*H & R Block v.*] *Testerman* [, 275 Md. 36, 338 A.2d 48 (1975) ].' " *Zenobia,* 325 Md. at 455, 601 A.2d 633. It noted the general principle that "punitive damages are awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability." *Id.* at 454, 601 A.2d 633. The Court then preliminarily held: "In a non-intentional tort action, the trier of facts may not award punitive damages unless the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.,* 'actual malice.' " *Id.* at 460, 601 A.2d 633 (footnote omitted).

We shall digress for a moment to note certain aspects of the majority's discussion in *Hartlove, supra,* a case upon which appellant relies extensively. The majority there noted that a "personal representative must '. . . act reasonably and in good faith.'" *Hartlove,* 111 Md.App. at 330, 681 A.2d 584. We said: "[The personal representative] . . . is required to act in good faith, and must perform his fiduciary duties with the same degree of care and diligence that would be exercised by a prudent person under similar circumstances. . . ." *Id.* (quoting *Bastian v. Laffin,* 54 Md.App. 703, 708, 460 A.2d 623 (1983)). The majority later noted that the standard of care for a fiduciary includes "[t]he exercise of reasonable watchfulness over investments; and . . . [t]he maintenance of full, accurate and precise records." *Id.,* 111 Md.App. at 330–31, 681 A.2d 584 (quoting Allan J. Gibber, *Gibber on Estate Administration* 3–1 (3d ed. 1991)).

It is clear then that carelessness and lack of diligence can be the basis for a breach of fiduciary duty action, as the *Hartlove* majority described the tort. Interestingly, the Court of Appeals in *Kann* noted, "Regina's quest for this new tort liability of trustees is particularly unpersuasive when one considers that there may be instances in which a trustee may commit a breach of trust mistakenly and non-negligently." *Kann,* at 711, 690 A.2d 509. Accordingly, while the action for breach of fiduciary duty may arise from intentional conduct, the cause of action may also arise out of careless and undiligent conduct, *i.e.,* negligent actions of omission or commission.

The *Zenobia* Court, although addressing a product liability action, set a standard for punitive damages that appears to be generally applicable, given the Court's earlier discussion of the problems created by punitive damages. It stated:

> The knowledge component, which we hold is necessary to support an award of punitive damages, does *not* mean "constructive knowledge" or "substantial knowledge" or "should have known." More is required to expose a defendant to a potential punitive damages award. The plaintiff must show that the defendant *actually* knew of the defect

and of the danger of the product at the time the product left the defendant's possession or control.

*Zenobia,* 325 Md. at 462, 601 A.2d 633 (footnote omitted). Still addressing strict liability causes of action, the Court opined:

> The showing of actual malice required for a punitive damages award is the same regardless of whether the plaintiff's claim for compensatory damages was based on strict liability or on negligence. In either case, the evidence must show malicious conduct and not simply the supplying of a defective product or negligence.

*Id.* at 465, 601 A.2d 633.

In a strict products liability cause of action, the plaintiff must establish that the product was defective; that it was unreasonably dangerous; that it caused injury; and that it reached the customer in the same condition. *Id.* at 464, 601 A.2d 633. The plaintiff is not required to prove any specific act of negligence. Once the above elements have been established, only certain defenses are permitted.

In a breach of fiduciary duty action (as it was created by this Court in *Hartlove*), a plaintiff must merely establish the existence of a fiduciary duty *and allege its breach.*[4] Once this is done, the defendant has the burden of establishing, *i.e.,* proving, that he has not committed the breach. Thus, in some respects, "strict liability" and "breach of fiduciary" actions are similar.

---

**4.** The trial court in *Hartlove* instructed the jury:

> Where either a confidential relationship or fiduciary duty exists, the burden of production of evidence falls upon the party in whom responsibility has been imposed to establish that his conduct was proper under the circumstances.
>
> Thus, as to the allegation by the Plaintiff of breach of fiduciary duty, it is the burden of the Defendant to produce evidence showing or tending to show that, in all material respects, he acted with fairness and candor....

*Hartlove,* 111 Md.App. at 326, 681 A.2d 584. We declined to address the issue of burdens of proof and production because the defendant did not challenge the trial court's instruction, a portion of which is quoted above. *See id.* at 333 n. 14, 681 A.2d 584.

In *Adams v. Coates*, 331 Md. 1, 626 A.2d 36 (1993),[5] the Court issued its writ of certiorari to answer two questions. The second question was: "[I]s it incumbent upon your petitioner to prove actual malice in a case involving an intentional breach of a fiduciary relationship between the parties." *Id.* at 3, 626 A.2d 36. The *Adams* trial court, discussing punitive damages for a breach of fiduciary duty, stated:

"I don't find any malice in the legal sense of the term in actual malice or anything of that matter. I don't believe that Mr. Adams has met his burden of proof in that area. If I was convinced . . . that punitive damages are available purely for a breach of a fiduciary duty, absent the showing of actual malice, then I would be inclined to award punitive damages. . . . So, I don't believe that on a sole proof of a breach of a fiduciary duty . . . that punitive damages are available because I don't find that you have proved malice, meaning actual malice."

*Id.* at 7, 626 A.2d 36. As can be readily discerned, appellant, in the case *sub judice*, is urging this Court to adopt the contrary position. Subsequently, the *Adams* trial court stated, "I do make a finding that fraud was not committed,[6] but that there was a breach of fiduciary duties." *Id.* at 7-8, 626 A.2d 36.

The Court of Appeals, after a factual discussion, then framed the argument and issues that it perceived were presented for determination:

The only issue for decision in the matter before us that turns on whether breach of fiduciary duty between partners can be asserted as a tort involves whether punitive damages are recoverable by Adams under the proof in this case.

---

**5.** In *Adams*, the Court of Appeals declined to adopt or reject an independent tort of breach of fiduciary duty that we later adopted in *Hartlove*, and that, as we have said, was subsequently disapproved in *Kann*.

**6.** As we have indicated, the fraud count or counts never made it to the jury in the case *sub judice*, and no issues are raised on appeal in respect to that count.

Whether punitive damages are recoverable is not determined exclusively by the elements of the tort, but depends primarily on Maryland policy as to the award of punitive damages. We shall assume, solely for the purpose of discussion in this case, the existence of a tort, and that, under proper proof, the tort can be the springboard for punitive damages. . . .

. . . We turn then to the second question on certiorari—whether, to obtain punitive damages, the plaintiff-partner must "prove actual malice in a case involving an intentional breach of a fiduciary relationship between the parties."

*Id.* at 12–13, 626 A.2d 36. The Court quoted portions of its opinion in *Zenobia* that related, in general, to punitive damages. It held:

To the extent that Adams's argument is that a breach of fiduciary duty in and of itself permits the award of punitive damages, we reject his contention under the policy guidelines for punitive damages in general, as set forth in *Zenobia*. To the extent that Adams's argument is that the facts in the instant matter support a finding of evil motive, intent to injure, or fraud, we hold that the circuit court was not clearly erroneous in finding an absence of actual malice or fraud.

*Adams,* 331 Md. at 13, 626 A.2d 36. The Court concluded:

By affirming the denial of punitive damages we hold simply that the circuit court was not clearly erroneous in finding a lack of evidence to support punitive damages. We intimate no opinion on whether, from the record as a whole, facts sufficient to support an award of punitive damages might be gleaned, had the trier of fact reached the opposite conclusion.

In any event, the trier of fact has discretion to deny punitive damages even where the record otherwise would support their award. *See Nast v. Lockett,* 312 Md. 343, 349, 539 A.2d 1113 (1988), *overruled on other grounds, Zenobia,* 325 Md. at 460, 601 A.2d 633; *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 616, 56 A.2d 813 (1948) (citing *Sloan v.*

*Edwards,* 61 Md. 89, 100 (1883)); Maryland Civil Pattern Jury Instructions 10:6(a), at 226 (1984) ("If you award plaintiff damages to compensate him for the actual ... [losses] he suffered, you may, *but are not required to,* award him an additional amount as punitive damages." (Emphasis added)).

*Adams,* 331 Md. at 15, 626 A.2d 36.

The Court, in *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 228, 652 A.2d 1117 (1995) (citing *Adams,* 331 Md. at 13, 626 A.2d 36), a case dealing with an action for fraud, again stressed that the "policy explained in Zenobia generally 'should govern any award of punitive damages,' including punitive damages arising from intentional torts." It noted that the

> trial court held that the "actual malice" required to support an award of punitive damages is inherent in the elements of a tort action for fraud or deceit. This holding was, of course, too broad, as the trial court did not, and could not have been expected to, anticipate the distinction which we have drawn between actual knowledge of the falsity and "reckless indifference."

*Id.* at 241, 652 A.2d 1117. As we have indicated, no fraud count went to the jury nor, we presume, was any fraud instruction given.

More recently, the Court in *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 540–50, 682 A.2d 1143 (1996), an asbestos case, reiterated:

> Moreover, under *Zenobia* plaintiffs in any tort case seeking punitive damages must prove knowledge and bad faith by a standard of "clear and convincing evidence" rather than the preponderance standard used to prove liability for compensatory damages. *Zenobia,* 325 Md. at 469, 601 A.2d 633. We reasoned in *Zenobia* that the heightened standard of proof was appropriate because not only money but stigmatization was at stake in an award of punitive damages. . . .
>
> . . . .

Clear and convincing evidence of bad faith to support a punitive damages award "goes far beyond that required to support a compensatory damages award based on the underlying strict liability claim. . . .

And lastly, in its most recent case concerning punitive damages, Judge Karwacki, in *Scott v. Jenkins*, 345 Md. 21, 29, 690 A.2d 100 (1997), stated:

We have lately, and at great length, discussed the necessary prerequisites to a punitive damages award. Lest there be any remaining doubt, in order to recover punitive damages in *any* tort action in the State of Maryland, facts sufficient to show *actual malice* must be pleaded and proven by clear and convincing evidence. . . .

In our review of the Court of Appeals's cases since *Zenobia*, we have seen no weakening of the *Zenobia* holding—rather, its scope, whenever possible, appears to have been extended. It was expressly extended to actions for breach of fiduciary duty (if the action had then existed) in *Adams* and to all tortious actions no later than *Scott*.

■ We hold, therefore, that the trial court did not err or abuse its discretion in its findings and instructions to the jury in regard to appellant's first question and did not err in respect to appellant's second question. With the jury's finding of no actual malice, there was no necessity for a bifurcated hearing, even if the trial court agreed to proceed in that manner. A defendant's net worth has no relevance to the issue of actual malice.

3. Whether the evidence, consisting of [appellant's] testimony concerning the amount of attorneys' fees incurred in this case, is sufficient to support the [appellant's] demand for attorneys' fees in the absence of expert testimony that the fees incurred were "reasonable."

The trial court declined to submit the issue of attorneys' fees to the jury because appellant had not presented any

testimony as to reasonableness during the presentation of her case.

Appellant testified:

Q   Mr. DeCaro is a good lawyer.  How much did you pay him?

A   For what?

Q   His work on your behalf advocating for you.

A   Totally in this case how much have I paid personally?

Q   How much did you pay him?

A   From the beginning to today, probably about $31,000, $32,000.

■    Under the "American Rule," attorneys' fees are not recoverable by the winning litigant.   Appellant at trial never asserted any authority supporting her claim for attorneys' fees.   In *Hess Constr. Co. v. Board of Educ.*, 341 Md. 155, 159–61, 669 A.2d 1352 (1996), the Court stated:

The "American Rule" is that attorney's fees are ordinarily not recoverable by a prevailing party in a lawsuit.   "In Maryland, '[t]he general rule is that costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for [compensatory] damages.' "

Attorney's fees may be awarded where a statute allows for the imposition of such fees, and where parties to a contract have an agreement regarding attorney's fees. Where the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, the plaintiff may recover from the defendant, as damages, reasonable counsel fees incurred in the action with the third party.   Additionally, a plaintiff in a malicious prosecution action, who has incurred counsel fees in the defense of the criminal charge, may be awarded those fees as damages in the civil action.

But exceptions are quite rare under Maryland common law to the general rule that counsel fees, incurred by the prevailing party in the very litigation in which that party prevailed, are not recoverable as compensatory damages against the losing party.   The principal exception is for

counsel fees incurred by an insured in successful litigation with a liability insurer which denied coverage or a duty to defend. In *Collier [v. MD–Individual Practice Ass'n,* 327 Md. 1, 17, 607 A.2d 537 (1992)] we called this exception under Maryland common law an "anomaly." [Some citations omitted.]

The Court concluded: "As a matter of substantive law under the American Rule, damages do not include counsel fees. The American Rule is so well established in Maryland that the mere mention of 'damages' in [former Rule] BE44 cannot be construed to include an exception to the American Rule." *Hess,* 341 Md. at 165–66, 669 A.2d 1352 (footnote omitted). In *Hess,* the Court of Appeals affirmed our *Hess Constr. Co. v. Board of Educ.,* 102 Md.App. 736, 651 A.2d 446 (1995), opinion. In its *Hess,* the Court of Appeals stated that Hess Construction Company (Hess), in its appeal to the circuit court and this Court, argued that counsel fees could have been awarded pursuant to the collateral litigation rule. The Court of Appeals noted that the collateral litigation rule had not been "embraced" within the grant of certiorari. The Court went on to note: "In any event, Hess was not engaged in litigation with a third party." *Hess,* 341 Md. at 159 n. 2, 669 A.2d 1352. In the case *sub judice,* there is no representation that the litigation is "third party" litigation.

We noted in our *Hess* that the Court of Appeals had discussed the collateral litigation rule in *McGaw v. Acker, Merrall & Condit Co.,* 111 Md. 153, 73 A. 731 (1909), and we quoted from an excerpt in that case:

The counsel fees and costs which the Court allowed the plaintiff to recover are not the counsel fees and costs involved in this litigation; but such only as were incurred in securing the new lease in its name. . . .

The general rule is that costs and expenses . . . are not recoverable . . . even . . . in a subsequent action; but where the wrongful acts . . . ha[ve] involved the plaintiff in litigation with others, or placed him in such relations with others as make it necessary to incur expense . . . such costs and

expense should be treated as the legal consequences of the original wrongful act.

*Hess,* 102 Md.App. at 750, 651 A.2d 446 (quoting *McGaw,* 111 Md. at 160, 73 A. 731). We explained:

> *McGaw, supra,* makes it clear that a claimant seeking counsel fees may prevail only when the wrongful acts of one of the parties to a contract has involved the claimant in litigation *with others....*
>
> In the case *sub judice,* the wrong alleged generated no action involving others.[7]

*Hess,* 102 Md.App. at 754, 651 A.2d 446 (quoting *Archway Motors, Inc. v. Herman,* 41 Md.App. 40, 44, 394 A.2d 1228 (1978), *cert. denied,* 284 Md. 741 (1979)).

Likewise, in the case *sub judice,* the action is a direct action, not a collateral action, and there is no "other litigation." To the extent the collateral litigation rule was pressed upon the trial court, it did not err in rejecting it.

At oral argument, appellant asserted that awards of attorneys' fees in breach of fiduciary duty actions are exceptions to the general rule that each party must pay its own litigation costs, including attorneys' fees. When queried about the source of her argument, she recited the cases in her brief. We have reviewed the cases she cited, including *Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337, 612 A.2d 322 (1992). *Homa* was a suit against an attorney and a law firm for fraud, breach of legal services contract, breach of contract, and breach of fiduciary duty. While judgment was rendered below against the attorney, the trial court awarded damages for the claims asserted and not for the costs of litigation and attorneys' fees incurred in prosecuting the case. *Homa* is simply inapplicable.

*Cosden v. Mercantile–Safe Deposit & Trust Co.,* 41 Md.App. 519, 398 A.2d 460 (1979), also cited by appellant, involved the approval of statutorily authorized attorneys' fees in respect to

---

7. For a more complete explanation of the collateral litigation rule, see *Hess,* 102 Md.App. at 740–55, 651 A.2d 446.

the administration of estates and trusts. Accordingly, it does not apply. Appellant's reliance on *DeLeon Enters. v. Zaino*, 92 Md.App. 399, 608 A.2d 828 (1992), is likewise misplaced. It involved a request for the trial court to impose attorneys' fees under Maryland Rule 1–341 as a sanction. The instant case is not a sanctions case. *Saint Luke Evangelical Lutheran Church, Inc. v. Smith*, 318 Md. 337, 568 A.2d 35 (1990), involved the issue of whether a jury could consider the plaintiff's attorneys' fees in assessing punitive damages. In that case, the Court of Appeals upheld the punitive damages by a four to three majority. The Court in *Saint Luke Church*, adopting the view that attorneys' fees may be part of the calculations in respect to punitive damages, nevertheless opined, "The American Rule reflects a widespread rejection of both general indemnity for litigants and a 'make-whole' rationale as a basis for awarding attorney's fees as an element of compensatory damages." *Id.* at 348, 568 A.2d 35. The issues presented on appeal in *Shapiro v. Massengill*, 105 Md.App. 743, 661 A.2d 202 (1995), did not include the appropriateness of attorneys' fees. Moreover, it was an action for breach of contract, wrongful discharge, and defamation. It did not concern a claim for breach of fiduciary duty.

■ In summation, the cases to which appellant directs our attention are all inapplicable. We know of no Maryland body of law that would except the new tort of breach of fiduciary duty, which we recognized in *Hartlove*, but that has since been "disapproved" in *Kann*, from the American Rule even if the cause of action remained viable.

■ Accordingly, we do not perceive that appellant, in respect to the only count that went to the jury, the at best interim independent tort of breach of fiduciary duty, was entitled to attorneys' fees. Moreover, given the extremely limited testimony on the issue and appellant's offhand and vague remark, "From the beginning to today, probably about $31,000, $32,000," even if the court had the power to submit attorneys' fees to the jury, it did not err or abuse its discretion in declining to do so. We shall not expend any further time to

describe what evidence, in an appropriate case, mandates such a submission. Whatever the standard would be, it was not met here.

4. Whether the trial court properly set aside the jury verdict awarding [appellant] the profits earned by [appellee] from the partnership after the death of the decedent.

The jury in the case *sub judice* returned a special verdict form that, after other questions, stated in relevant part:

What damages, if any, proximately caused by [appellee's] breach, do you award the [appellant]?

| Deposition fees | $ 900.00 |
| Appraisal fees | $ 7,500.00 |
| Profits | 62,500.00 for ½ business |

As indicated above, in respect to profits, the special verdict read "Profits *62,500.00 for 1/2 business.*" When giving or reading the verdict form, the foreperson used the same language.

The sum of $62,500 was the exact amount at which the estate's one-half interest in the business had been appraised. Appellant had argued that she was entitled to $20,000 a year, for a total of over $90,000 in lost profits. It is certainly unclear how the jury arrived at a figure of $62,500 and then stated that it was awarded "for 1/2 business." The $62,500 is exactly the sum that the court had instructed the jury had already been determined and resolved in another proceeding. The difficult question for this Court is whether the circuit court was correct when it reformed the, to it, ambiguous jury verdict.

We initially note that there was evidence that the business generated sufficient income to support appellant's assertion that a one-half share of the profits would amount to $20,000 per year over the three or more years of the dispute. There was, therefore, sufficient evidence, if believed by the jury, for a monetary sum in excess of the $62,500 written on the verdict sheet. The trial court's consternation appears to have been caused by the sum awarded being the same amount of the value of one-half the business plus the language used "for 1/2 business." Had the jury awarded, for instance, a sum of

$20,000 or $80,000 with the words "for 1/2 business," we would perceive that the trial court may have termed the words "for 1/2 business" to have meant "for 1/2 profit of business." It is clear from the trial court's comments that it was the sum of $62,500 that caused him to conclude that the jury was awarding a sum for the business itself and not the profits.

To us, an alternate reason for the jury's award, and the use of the language, is apparent. The jury was awarding profits, but was unwilling to award one-half of the profits in an amount greater than one-half of the value of the business. This type of inferential conflict is one reason that it is generally accepted that juries occasionally make compromises based upon the jury's concept of justice when it addresses the facts of a given case within the framework of a trial judge's instructions. This is why courts are generally reluctant to ascribe reasons to the compromises of juries and to void verdicts that are otherwise supported by the evidence.

In *Traylor v. Grafton*, 273 Md. 649, 332 A.2d 651 (1975), in which a sum of liquidated damages had been agreed upon, the trial court corrected a jury's verdict that was silent on that issue. The Court of Appeals noted: "The trial court possessed the power to correct a verdict *which may be defective in form* but which clearly and definitely expresses the intention of the jury. A verdict which is returned informally may be molded into proper shape by the trial court...." *Id.* at 683, 332 A.2d 651 (emphasis added) (citations omitted). In *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 446, 340 A.2d 705 (1975), the Court noted that a jury verdict can be "molded or reformed [by a court] to reflect what the jury manifestly and beyond doubt intended." *See also ACandS, Inc. v. Godwin*, 340 Md. 334, 405, 667 A.2d 116 (1995).

The Court of Appeals discussed when modification of a jury verdict is inappropriate in *Gaither v. Wilmer*, 71 Md. 361, 18 A. 590 (1889). In that case, a defense of set off had been asserted in a case involving the collectibility of certain promissory notes. The jury returned a sealed verdict that stated that they "find for the plaintiff." However, the verdict did not

assess damages. The trial court polled the jury and then excused them. Later, the defendant's attorney moved for a new trial. While the motion was pending, the plaintiff's attorney asked the court "to re-assemble the jury, and to direct them to enter in their verdict for the plaintiff the sum of $5,378.72" (a sum agreed during trial would be the correct amount of plaintiff's claim if the plaintiff prevailed on its claim). *Id.* at 363, 18 A. 590. The defendant denied the agreement and again moved for a new trial on the ground that the "verdict is uncertain, irregular and a nullity." *Id.* Later, the trial court inserted after the jury's verdict "for the plaintiff," the words "for the sum of $5,378.72." The Court of Appeals opined:

Without doubt, a verdict, in an action like the present, simply "for the plaintiff," without stating the damages, or the amount the plaintiff is entitled to recover, is fatally defective. It is not merely an informal verdict, which the court can mould into proper shape by referring to the pleadings and issues, but it is substantially defective. In all cases where the action is upon a contract or for damages, the verdict, if for the plaintiff, must be for an amount specified; otherwise the court cannot enter judgment upon it for any amount.

The question, then, is, had the court power to amend this verdict, and make it effective by inserting the amount the plaintiff was entitled to recover, at the time and under the circumstances stated? The amendment was made after the verdict was assented to by the jury, when called upon to hearken to it after it had been duly recorded, and several days after the jury had separated. The defect was discovered by the Judge when the verdict was handed to him before it was recorded, and when the jury were in attendance in open court for the purpose of rendering their verdict. It was then competent for the jury to reject this verdict in *toto*, and find another, or to vary, or correct it. The Judge, also, could then have sent them to their room, with instructions to correct this defect, whether counsel assented or not; and this was the course that should have been adopted. . . .

... [B]ut in States where the common law is the only guide on the subject, we think the decided weight of authority is against allowing such a thing to be done; and we have found no American case in which an amendment like this, in matter of substance, has been made upon affidavits, or from the Judge's recollection of what occurred at the trial, after the imperfect verdict has been duly recorded, and the jury have separated. A citation or review of these authorities is unnecessary, because it seems to us that the question has been settled in Maryland by the decisions of this court.

... [I]n the more recent case of *Ford v. State*, 12 Md. [514,] 546 [ (1849) ]—a case most carefully considered—our predecessors have laid it down broadly and emphatically that "if a jury, through mistake or partiality, deliver an improper verdict, the court may, before it is recorded, desire them to reconsider it. They cannot, however, be allowed to make alteration after the verdict is recorded"; and this case was re-affirmed in *Williams v. State*, 60 Md. 402 [ (1883) ]. These authorities have, in our judgment, settled it as law in this State, that no material alteration can be made by the jury in their verdict, either in a civil or criminal case, after it has been recorded, and, if this can not be done by the jury, *a fortiori* can it not be done by the court or the Judge.

. . . .

In conclusion, we may say we are firmly convinced that the adoption of any other rule on this subject than that so plainly laid down by our predecessors, and so long adhered to in practice by the courts of the State, would be dangerous in the extreme, would open the door to abuses, and lead to doubtful and possibly pernicious results; and we can not escape the legal conclusion that, by making the amendment complained of in this case, the Judge has invaded the exclusive province of the jury, and substituted his verdict for theirs.

*Gaither*, 71 Md. at 364–68, 18 A. 590 (some citations omitted). The *Gaither* Court had previously opined that it would have been proper for the trial court, before the jury was excused, to

have submitted a supplemental verdict sheet to them for their further consideration. *See id.* at 365, 18 A. 590.

Over one hundred years later, this aspect of Gaither was discussed, and to some extent, found to be determinative in *Nails v. S & R, Inc.,* 334 Md. 398, 639 A.2d 660 (1994). In *Nails,* the jury rendered a verdict and was polled on that verdict. The parties and their attorneys were then told that they were excused, and that the verdict was final. At that point, however, the court was asked to submit an additional issue to the jury, which was still in the jury box; it had apparently not been excused.[8] One of the issues in *Nails* was whether the trial court could have submitted a supplemental issue to the jury. While the real question was whether the new issue could be submitted to a jury, and did not involve a trial court's reformation of a jury's verdict, the Court, discussing *Gaither* at some length, stated:

This Court has consistently indicated that, in civil cases, a trial judge has the authority to have a jury deliberate further and amend its verdict as long as the jury has not been discharged and left the court room. Thus, in *Gaither v. Wilmer,* 71 Md. 361, 18 A. 590 (1889), the jury returned an obviously incomplete verdict which purported to "find for the plaintiff" without specifying any amount of damages....

: ...

... Instead, the issue here is governed by this Court's opinions in *Ager v. Baltimore Transit Co.,* [213 Md. 414, 418, 132 A.2d 469 (1957)]; *Gaither v. Wilmer, supra,* and similar cases. In light of the opinions in these cases, we hold that, in a civil case, after a jury has rendered an initial verdict, the trial judge ordinarily may ask the jury to amend, clarify or supplement the verdict in order to resolve an ambiguity, inconsistency, incompleteness, or similar problem with the initial verdict, up until the jury has been discharged and has left the court room.

---

8. The headnote indicates that the jury had been excused. That appears incorrect.

The trial judge's submission of the supplemental verdict sheet to the jury was fully justified in this case. There was a degree of ambiguity and possible inconsistency in the jury's initial verdicts, and the supplemental verdict helped clarify the ambiguity and possible inconsistency. . . .

. . . .

. . . The supplemental verdict sheet, with specific findings by the jury that each of the plaintiffs had been induced by fraud to enter into the employment contracts, clarified the ambiguity in the initial jury verdicts and supported the award of punitive damages.

*Nails,* 334 Md. at 408–15, 639 A.2d 660 (citations omitted).

Citing to *Gaither,* in *Polkes & Goldberg Ins., Inc. v. General Ins. Co.,* 60 Md.App. 162, 167, 481 A.2d 808 (1984), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985), we said, "Generally, a judge has no power to reform a jury's verdict." We then noted that there are exceptions, one of which is that a trial judge "is empowered to correct, remold or reform the verdict . . . so as to express the jury's intent if that intent is, *beyond doubt,* clearly and definitely manifested." *Id.* (emphasis added). We noted in that case that the jury's intent was "far from clear and definite." *Id.* We also noted that *Gaither* was then the only Maryland case in which a "trial judge endeavored to correct an improper verdict after it was recorded" and that other jurisdictions had generally held that a trial judge could not "invade the province of the jury under the guise of amending the verdict." *Polkes & Goldberg,* 60 Md.App. at 169, 481 A.2d 808. We held:

Trial judges may, under Maryland law, change a verdict and remold it if the modification is one of form, *Davis v. Board of Educ.,* 168 Md. 74, 78–79, 176 A. 878 (1935), and "the intention of the jury is manifest and *beyond doubt,"* (emphasis supplied) *Hawks v. Crofton,* 2 Burrows 698, 699 (K.B.1758), quoted in *Diamond State Telephone Co. v. Blake,* 105 Md. 570, 575, 66 A. 631 (1907); *Browne v. Browne,* 22 Md. 103, 115 (1864).

The jury's verdicts on special issues in the case at bar were not altered as to form but rather as to content.... In effect, the judge wiped out the jury's verdict with respect to Polkes's liability to Thompson's and General. He then substituted for the jury's verdicts what he thought the verdicts should be.

*Polkes & Goldberg,* 60 Md.App. at 169–70, 481 A.2d 808 (citations omitted).

■ As far as we have been able to discern, the only change in the law since *Gaither* is that announced in *Nails, i.e.,* if the jury is still in the jury box, a supplemental issue may be submitted to it after it has rendered a verdict on the issues originally presented to it. We now examine what occurred in the case *sub judice.*

■ After the jury had returned and rendered its verdict, it was polled and its foreperson used the language of the jury's response on the verdict sheet in her response. The jury confirmed that verdict and was then excused. The judgment, indicating the damages for profits, was later recorded on March 21, 1996. The next day, appellee filed a motion for judgment notwithstanding the verdict in which he raised the language and amount used by the jury on the special verdict sheet. The docket entries reflect the trial court's disposition of this issue almost three months later:

Granted as to award for profits. At the direction of the court the 03/14/96[9] judgment in the amount of $62,-000.00[10] for profits is stricken and judgment for the [plaintiff] in the amount of $–0– (zero) is entered for profits.

We earlier noted that there was evidence before the jury that could have permitted it to make an award for profits of up to $91,000, according to appellant's evidence. The trial judge was directed by appellee's post-trial motion to the similarity of the sum awarded to the value of one-half of the

---

**9.** The date was in error.

**10.** The amount was in error.

business. We have indicated, however, that from these facts, an inference can also be made that the jury chose to cap its award of damages for profits at the value of the one-half interest in the business. In any event, coincidence or lack thereof does not make a jury's verdict inconsistent or reformable by a trial judge, so long as the total sum awarded does not exceed the evidence supporting the award. See *Birkey Design Group, Inc. v. Egle Nursing Home, Inc.*, 113 Md.App. 261, 687 A.2d 256 (1997), which involved an arbitrator's award in an amount only seventy-two cents less than the attorney's fees. Appellant argued that the sum awarded was indicative that the arbitrator had impermissibly awarded counsel fees. We said:

> On its face, the award represents a plausible interpretation ... judicial inquiry ceases and the award must be enforced....
>
> ...It is not this Court's function to speculate about the arbitrator's thought process when making an award.... Since it is possible that the award comprised damages rather than attorney's fees, we must assume the arbitrator acted properly.

*Id.* at 267, 687 A.2d 256. We hold that the trial judge erred in granting appellee's motion for judgment notwithstanding the verdict in reference to the damage award for profits. Upon receipt of our mandate, the trial court is directed to reinstate the jury's award for profits.

5. Whether the trial court properly allowed the deed to the partnership real estate to be released to [appellee] prior to the conclusion of these proceedings.

Because of the present posture of the case, this should no longer be an issue, if it ever was an appropriate issue, and, in light of our decision, it appears to be moot. Because we have already expended much effort to resolve the other issues and have no desire to engage in intellectual musings as to the propriety of the timing of the release of the deed, we shall not further discuss the interesting issue of whether appellant can raise the propriety of the release of the deed after she

removed the deposited sum due her, thus benefiting from that order she now protests.

### Appellee/cross-appellant's Question

Did the trial court err in entering judgment for [appellant] for deposition costs and appraisal fees, and in failing to grant [appellee's] motion for judgment notwithstanding the verdict in this respect.

We have earlier indicated that the parties have not directed us to the place in the proceedings that they objected to the special verdict form used in respect to deposition costs. We have been unable to find in the table of contents or the extracts where any such objections were made.[11]

In this case, appellant initially filed a two-volume Joint Record Extract, then a Supplemental Joint Record Extract, and then a separately filed Supplemental Joint Record Extract. Thereafter, when appellant filed her reply brief, she added an appendix to it. As we noted below, the parties in their arguments have not indicated where in these record extracts we can find any objection to the verdict form; neither do they direct us to the trial court's instructions on these issues nor to where objections to such instructions may be found. Likewise, they do not direct us to any objections made below to appellant's counsel's closing arguments as to deposition costs.

We have examined those areas in respect to appraisal fees to which our attention has been directed.[12] The issue of the awarding of appraisal fees was sufficiently presented to the trial court by appellee/cross-appellant. In *Freedman v. Seidler*, 233 Md. 39, 194 A.2d 778 (1963), cited by appellee/cross-

---

11. The parties are supposed to direct our attention to where, in the extract, relevant information is to be found. We are not required to cast about for it.

12. In his brief, appellee's counsel uses the terms "accounting fees" and "appraisal fees" interchangeably. The special verdict form uses "appraisal fees." We presume, therefore, that he means "appraisal fees."

appellant, the Court, in effect, applied the "American Rule" to the recovery of a party's costs of accounting.

■ Appellant/cross-appellee has directed us to no statute or case law providing that the costs of appraisal incurred by a party (not taxed as costs of suit) may constitute a measure of damages for which a plaintiff is entitled to be compensated. Neither does she direct our attention to any authority stating that appraisal costs are an exemption to the general rule that each party is to bear the costs of prosecuting or defending litigation. The *Freedman* Court said:

> The injured tenant insists, and perhaps with some merit in a case such as this where the services of an accountant were necessary to show loss of profits, that she should be reimbursed for the expense of such services. But, in the absence of statutory authority permitting it, we think the charges of the accountant are not recoverable either as an element of damages or as a part of the costs. Compare point (iii) of this opinion, where, with respect to the allowance of counsel fees, it is said that the general rule is that costs and expenses other than actual court costs are not recoverable in an action for damages. We think the same rule is applicable to accountants['] charges, for we see no distinction in principle between such charges and attorneys['] fees.

*Id.* at 47, 194 A.2d 778.

In *Empire Realty Co. v. Fleisher,* 269 Md. 278, 305 A.2d 144 (1973), a fraud case, the trial court awarded attorney's fees, recording charges, title insurance, engineering fees for test borings, and an additional sum of $10,500 for costs incurred in retaining the services of a realtor. The Court, in discussing the trial court's award of counsel fees, noted: "The general rule is that, other than usual and ordinary court costs, *the expenses of litigation*—including legal fees incurred by the successful party—are not recoverable in an action for damages." *Id.* at 285–86, 305 A.2d 144 (citations omitted)(emphasis added).

Accordingly, we conclude, in the absence of being directed by appellant/cross-appellee to a statute creating an exception

to the general rule, that she was not entitled to an award for appraisal fees, and we shall reverse the award of appraisal fees.

JUDGMENT OF $7,500 FOR APPRAISAL FEES IS RE-VERSED; TRIAL COURT'S GRANTING OF APPEL-LEE'S/CROSS-APPELLANT'S JUDGMENT NOTWITH-STANDING THE VERDICT THAT REFORMED THE JURY VERDICT AS TO PROFIT DAMAGES IS RE-VERSED; TRIAL COURT IS DIRECTED TO REIN-STATE THE JURY VERDICT FOR PROFIT DAMAGES IN THE SUM OF $62,500; IN ALL OTHER RESPECTS, JUDGMENT IS AFFIRMED; COSTS TO BE PAID 50% BY APPELLANT/CROSS-APPELLEE, 50% BY APPEL-LEE/CROSS-APPELLANT.[13]

---

13. We realize that our mandate leaves intact a verdict and judgment predicated upon a cause of action that did not exist when the verdict was rendered below and may not exist as we render our mandate, but that may have existed for but a brief period in the interim. Because the trial court had jurisdiction to entertain then existing causes of action that incorporated breaches of fiduciary duty, it had jurisdiction. Because no appeal was taken, nor objection made below, the issue of the existence of the cause of action was waived *in this case.*