626 A.2d 36

**David M. ADAMS**

v.

**Robert Jerry COATES.**

**No. 90 Sept. Term, 1992.**

Court of Appeals of Maryland.

June 11, 1993.

Reconsideration Denied July 21, 1993.

2

Marc G. Rasinsky, Westminster, argued and on brief (Scott & Rasinsky, and Kenneth M. Williams, Dulaney & Leahy, on brief), for petitioner.

Lucien T. Winegar, argued and on brief, Frederick, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Following decision by the Court of Special Appeals in an unreported opinion, we issued the writ of certiorari in this case to consider the two following questions:

"May a circuit court grant punitive damages in [a] case of an equitable nature that was decided subsequent to the adoption of Maryland Rule 2–301, merging law and equity[;]" and

"[If] the equitable nature of the proceedings does not preclude the award of punitive damages, is it incumbent upon your petitioner to prove actual malice in a case involving an intentional breach of a fiduciary relationship between the parties."

The fiduciary relationship referred to is that between partners.

The petitioner, David M. Adams (Adams), and the respondent, Robert Jerry Coates (Coates), met in 1958, began living together later that year, and lived together continuously until October of 1984 when Coates left their joint home. Through most of this period Adams, a speech and language pathologist, had been employed by the Board of Education of Frederick County. He was terminated from that employment in January 1985 during a period of complete emotional collapse resulting from his separation from Coates. Adams received full salary from the Board of Education, however, through 1985. Coates was licensed as a real estate broker in 1970. Personally and on behalf of clients, he has been active in the market for investment properties in the Frederick area.

Beginning in the early 1970s the parties became involved in many business ventures together, the core of which was real estate investment. In 1978 Coates, another broker, and Adams, who then obtained a real estate salesperson's license, created Fredericktowne Realty Incorporated (FRI), a real estate agency that subsequently grew to ten associate brokers and approximately thirty-five salespersons.

By an agreement resting in parol and on conduct, Adams and Coates formed an equal partnership with respect to their mutual investments in realty and in personalty. They owned a number of properties in the Frederick area, including their home on Westwood Drive, a condominium in Washington, D.C., a lot on a lake in Kentucky, and a cottage in Largent,

West Virginia. In general, they took title to the real estate in which they invested as joint tenants. They also invested in gold coins, a collection of stickpins, and other personalty.

The financial operations of the parties during their relationship were characterized by mutuality. Although Coates had a larger earned income than Adams, the parties pooled in one or more joint bank accounts their earned income, the investment income from their properties, and the gains on sales of properties. From these accounts they paid their personal living expenses, which included relatively extensive travel in the United States and in foreign countries, and their business expenses. Accumulated capital was utilized as the down payment to purchase additional properties with mortgage financing.

It appears that, for many years prior to an audit by the Internal Revenue Service, Adams and Coates each reported fifty percent of the net income from their investments directly on their individual income tax returns. At the urgings of an IRS agent and utilizing the professional services of an accountant, the parties, beginning with calendar year 1984, filed partnership returns of income and the associated K–1 forms. They called the partnership ADCO Joint Venture (ADCO). Title to the underlying, income-producing assets was not changed to the ADCO name. The bank account that the parties used as an accounting control of their investment income and expenses was known as the ADCO account.

When Coates terminated the personal relationship between the parties, he also dissolved their partnership. " 'Dissolution' means the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Md.Code (1975, 1993 Repl.Vol.), § 9–101(e) of the Corporations and Associations Article (CA).[1] From an orderly, legal standpoint, the next phase in the affairs of a dissolved partnership is its

---

1. Title 9 of the Corporations and Associations Article is the Maryland Uniform Partnership Act. *See* CA § 9–703.

winding up, but the winding up of the subject partnership seems not to have been orderly or fully completed.

Initially, ADCO accounts had been opened at Fredericktowne Bank & Trust Co. (Fredericktowne). Adams had expected those accounts to require two signatures for withdrawal. Questions raised by Adams with that bank, when he learned that Coates had withdrawn funds on the latter's signature alone, resulted in a practical freeze on the accounts for some months. In order to be able to manage the properties and allegedly on the advice of Adams's former attorneys, Coates, in the beginning of 1985, opened a new ADCO account at the Farmers & Mechanics National Bank (F & M) on which only Coates's signature was required.[2] Thereafter, ADCO funds were deposited to this account, without endorsement by Adams. Withdrawals from this account by Coates, for personal purposes, form the bulk of the claims asserted by Adams in the issues on appeal.

Adams remained in the house on Westwood Drive, and Coates took the position that Adams should pay all of the expenses of carrying the property. Adams did not keep the mortgage current. In January 1986, Coates filed the instant action against Adams. It was initiated as a complaint for sale, in lieu of partition, of the Westwood property. Adams counterclaimed. When the case came to trial in September 1989 the partition sale had been resolved, and Adams stood on his "Fourth, Supplemental, Revised and Consolidated Counter Complaint," as amended.

Following a court trial, judgment was entered in favor of Adams against Coates on certain counts, trustees were appointed to sell certain property, and the rights of the parties concerning FRI and myriad items of personalty were resolved.

---

2.  There was substantial dispute over whether Adams's former attorneys suggested that a sole signature account be opened by Coates. Adams's former attorneys denied having suggested that Coates open a sole signature ADCO account or having authorized such action, although Adams testified that he recalled one of his former attorney's suggestion that a new ADCO account be opened.

We are concerned here with the judgment entered on Count II of Adams's counterclaim in the amount of $10,504.50, together with prejudgment interest of $3,187.80, and with the judgment entered on Count V of that pleading in the amount of $24,782.86, with prejudgment interest of $5,235.18.

The judgment on Count II represents two transactions. One transaction is known to the parties by its promotor's name, Taylor–Masser. In consideration of several monthly payments of $2,000 each, made from a joint savings-investment account at Fredericktowne, Coates obtained either the right to acquire an equity position in a real estate investment, absent repayment of the advances by the promotor, or Coates acquired an equity position subject to its being reacquired by the promotor upon repayment of the advances with interest. In any event, Taylor–Masser repaid Coates $11,009.04, thereby terminating the Coates equity position. The circuit court reasoned that Adams was entitled not only to one-half of the original principal investment, but also to half of the interest or profit on the transaction, so that one-half of $11,009.04, *i.e.*, $5,504.50, was included in the judgment on Count II in favor of Adams.[3] In the other transaction Coates withdrew $10,000 from the joint savings-investment account at Fredericktowne and utilized the funds to make a personal investment through an investment banking firm.[4]

The principal amount of the judgment on Count V is precisely the principal amount claimed by Adams in the final amendment to Count V of his counterclaim. It represents interest earned and the return of capital on three separate mortgages owned by the parties, which were paid in full by the mortgagors. These funds were deposited by Coates in the F & M ADCO account, withdrawn by him, and used for his personal purposes. At trial, Coates did not dispute that he had done so.

---

3. Apparently the $.04 was inadvertently left out of the judgment.

4. When he noticed this large withdrawal, Adams questioned Coates about its purpose. Coates told Adams that it was for investment in the Taylor–Masser transaction of which Adams was aware.

ADCO's federal and state partnership returns of income, ADCO's K–1 forms for Adams and for Coates, and the balance sheets for ADCO for the calendar years 1985 through 1988 were introduced into evidence. These financial statements and tax returns were prepared by an accountant. They clearly summarize the withdrawals by Coates and Adams. The two partners' capital accounts are summarized from those exhibits and presented in the appendix that follows this opinion. As of December 31, 1988, Adams's capital account was approximately $25,000 while Coates was overdrawn by somewhat more than $17,000.

Coates testified that this data periodically was furnished, by mail and hand carried, to Adams, either directly or through his attorney.

Adams's claims for relief had included requests for punitive damages. The circuit court, after awarding the damages described above, initially denied punitive damages. With respect to Count V the court concluded:

"I don't find any malice in the legal sense of the term in actual malice or anything of that matter. I don't believe that Mr. Adams has met his burden of proof in that area. If I was convinced ... that punitive damages are available purely for a breach of a fiduciary duty, absent the showing of actual malice, then I would be inclined to award punitive damages.... So, I don't believe that on a sole proof of a breach of a fiduciary duty ... that punitive damages are available because I don't find that you have proved malice, meaning actual malice."

With respect to Count II, the Court said: "Again, I don't find any malice on the part of Mr. Coates, no actual malice.... If a breach of fiduciary duty alone allowed that, punitive damages would also have been considered on count II."

Near the conclusion of the same argument, counsel for Adams suggested that the court had not made any finding on fraud. The court ruled, "I do make a finding that fraud was

not committed, but that there was a breach of fiduciary duties."

.Adams filed post-judgment motions and prevailed on the circuit court to defer its ruling on the punitive damages issue raised therein. Under Maryland law at the time of trial, punitive damages could not be awarded on a tort arising out of a contract, unless there was actual malice. This is the *Testerman–Wedeman* rule. *H & R Block, Inc. v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975); *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 366 A.2d 7 (1976). In *Miller Bldg. Supply v. Rosen*, 305 Md. 341, 503 A.2d 1344 (1986), we had applied the *Testerman–Wedeman* rule in affirming the disallowance of punitive damages in an action by an employer against outside sales employees who had diverted their employer's business to their own gain. In the case before us the circuit court initially had concluded that the fiduciary duties arising from the principal and agent relationship involved in *Miller Bldg. Supply* were analogous to the fiduciary duties between partners, but the circuit court was also aware of the fact that a case involving the *Testerman–Wedeman* rule was then pending before this Court. Decision on the post-judgment motions was deferred awaiting our decision. That appeal, *Schaefer v. Miller*, 322 Md. 297, 587 A.2d 491 (1991), decided by an evenly divided Court, left the *Testerman–Wedeman* rule standing, but obviously imperiled.

By Order of April 24, 1991, the circuit court, "having ... read and considered" the opinion in *Schaefer v. Miller*, denied Adams's motion on the reserved issue and refused to alter the denial of punitive damages. The *Testerman–Wedeman* rule, with its distinction based upon torts arising out of a contract, was abandoned by this Court on February 14, 1992. *See Owens–Illinois v. Zenobia*, 325 Md. 420, 455, 601 A.2d 633, 650 (1992).

Adams appealed to the Court of Special Appeals, contending that he should have been awarded punitive damages on Counts II and V. At oral argument before it, the intermediate appellate court suggested that the action was equitable in

nature so that punitive damages were not available.[5]  In its unreported opinion, the Court of Special Appeals so held.

The court pointed out that the gravamen of Adams's claims was that Coates "had distributed to himself partnership property to which he was not entitled." *Seeley v. Dunlop,* 157 Md. 378, 383, 146 A. 271, 273 (1929), was quoted for the proposition that " 'one partner may not sue his copartner at law, unless the cause of action was so distinct from the partnership accounts as not to involve their consideration, or the amount recovered would be wholly the separate property of the plaintiff.' "  The Court of Special Appeals then held that "[b]ecause this was exclusively an action by one partner against another for misappropriation of partnership assets, it was exclusively an equitable action, and ... punitive damages are not allowed."  For the latter proposition the Court of Special Appeals relied on Judge Hammond's opinion for this Court, on reargument, in *Superior Constr. Co. v. Elmo,* 204 Md. 1, 14, 104 A.2d 581 (1954).

Adams then successfully petitioned this Court for certiorari, raising the two issues that we quoted in the opening of this opinion.

I

Counts II and V are premised on the fiduciary duty owed between partners.  But for including a claim for punitive damages among its requests for relief, Count II pleads a traditional action for an accounting.  CA § 9–404(a) provides that

"[e]very partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him

---

5.  In argument before the circuit court Coates's counsel had argued: "Much of their relief is equitable.  They're asking for accounting, they're asking for sale in lieu of partition and so forth.  I think it's an open question as to whether or not they—that you can get punitive damages in equity, and I think that they're coming into this court seeking equity."
The circuit court, having expressed the view that Adams could have obtained a jury trial on the issues, rejected the contention.

without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property." Under CA § 9–405(3), "[a]ny partner shall have the right to a formal account as to partnership affairs ... [a]s provided by § 9–404."

Under Maryland practice antedating the 1984 merger of law and equity for pleading and other purposes, an accounting action could be maintained in equity when the remedies at law were inadequate. Among the scenarios in which legal remedies were considered inadequate was "where a fiduciary relation exists between the parties, and a duty vests upon the defendant to render an account." E. Miller, *Equity Procedure* § 721, at 823 (1897). Thus, Count II's punitive damage claim rests on the assumption that effect can be given to a request for punitive damages appended to a cause of action sounding in equitable accounting.

One of the differences between Count V and Count II is the former's allegation of misrepresentation. Count V averred the opening of the ADCO account at F & M and the deposit therein of mortgage proceeds, including $1,950 of interest from Frederick D. Jackson (Jackson) on or about July 30, 1985. Adams averred that Coates breached his obligation to Adams who was "deprived of his share of the proceeds." Adams further averred that on or about July 27, 1985, he inquired of Coates whether the interest due from Jackson had been paid and that Coates represented that Jackson's note had been extended, so that no interest was due. That misrepresentation by Coates is alleged to have been repeated in August of the same year. Adams averred that he reasonably relied on the misrepresentation and took no action against Coates with the result that he "did not receive the monies paid by" Jackson and "suffered damages in the amount of $975," *i.e.*, one-half of $1,950. Count V initially sought compensatory damages of $975 and punitive damages of $100,000. By amendment, compensatory damages sought were increased to $24,782.86, representing one-half of the repayments of three mortgages and the $1,950 interest payment.

■ In argument before the circuit court counsel for Adams described Count V as a fraud count, but it is not. Adams's entitlement to half of the mortgage repayments lies in his fifty percent interest in the partnership. He did not part with that entitlement as a result of the alleged misrepresentations. One of the elements of an action of deceit is that the plaintiff " 'not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that [the plaintiff] would not have done the thing from which the injury resulted had not such misrepresentation been made.' " *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 333, 439 A.2d 534, 537 (1982) (quoting *Gittings v. Von Dorn*, 136 Md. 10, 15, 109 A. 553, 554 (1920)). Under the allegations, the misrepresentation caused a delay in Adams's seeking the ADCO account portion of his distributive share in the winding up of the partnership, but that is an injury that was remedied by the award of prejudgment interest in this case. *See* Restatement (Second) of Torts § 913, at 488 & cmt. a (1979).

The Court of Special Appeals made no distinction between Counts II and V as to the nature of the action. Under that court's analysis both counts are part of the overall accounting. In pleading his counterclaim Adams allocated to Count V transactions that involved deposits to the ADCO account and allocated other transactions to Count II. The circuit court's judgment simply followed those allocations.

■ As an alternative analysis, Adams contends that both Counts II and V, and particularly Count V, can be viewed as alleging a tort, which Adams labels as the tort of "breach of fiduciary duty." Restatement (Second) of Torts § 874, captioned "Violation of Fiduciary Duty," states the rule that "[o]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." [6] Breach of fiduciary duty, as a

_____

6. Comment b to Restatement (Second) of Torts § 874 in part observes: "The local rules of procedure, the type of relation between the parties and the intricacy of the transaction involved, determine whether the beneficiary is entitled to redress at law or in equity. The remedy of a

tort, has been alleged by pleaders whose cases have come to this Court, and our opinions have used the term to describe claims asserted, but we have not opined on the existence of the tort or torts, or on its or their elements or rules of damages. *See, e.g., Marr, P.C. v. Langhoff,* 322 Md. 657, 663–64, 589 A.2d 470, 473 (1991); *Schaefer,* 322 Md. at 309, 587 A.2d at 497. We need not so opine in this case.

█ The only issue for decision in the matter before us that turns on whether breach of fiduciary duty between partners can be asserted as a tort involves whether punitive damages are recoverable by Adams under the proof in this case. Whether punitive damages are recoverable is not determined exclusively by the elements of the tort, but depends primarily on Maryland policy as to the award of punitive damages. We shall assume, solely for the purpose of discussion in this case, the existence of a tort, and that, under proper proof, the tort can be the springboard for punitive damages. Similarly, with respect to the analysis by the Court of Special Appeals, we shall assume, solely for the purpose of discussion in this case, that neither Maryland pleading nor substantive law bars the award of punitive damages in an otherwise appropriate case simply because the action, viewed historically, was classified as an equitable one for an accounting arising out of the dissolution of a partnership.

In other words, in answer to the first question presented on certiorari, we shall assume, *arguendo,* that a circuit court, under the current Maryland Rules, may grant punitive damages under appropriate circumstances in one partner's action for an accounting against the second partner in a two person partnership. We turn then to the second question on certiorari—whether, to obtain punitive damages, the plaintiff-partner

---

beneficiary against a defaulting or negligent trustee is ordinarily in equity; the remedy of a principal against an agent is ordinarily at law. However, irrespective of this, the beneficiary is entitled to tort damages for harm caused by the breach of a duty arising from the relation, in accordance with the rules stated in §§ 901–932."
The referenced sections include §§ 908 and 909, dealing with punitive damages.

must "prove actual malice in a case involving an intentional breach of a fiduciary relationship between the parties."

## II

*Zenobia*, although particularly concerned with the standard for punitive damages in product liability and negligence cases, also addressed the policy that should govern any award of punitive damages.

"'[T]he purposes of punitive damages relate entirely to the nature of the defendant's conduct.' *Schaefer v. Miller*, *supra*, 322 Md. at 321, 587 A.2d at 503. Whether the tort occurred before or after the formation of a contractual relationship should not determine whether actual or implied malice is required for allowing an award of punitive damages. Rather, the availability of a punitive damages award ought to depend upon the heinous nature of the defendant's tortious conduct.

"Awarding punitive damages based upon the heinous nature of the defendant's tortious conduct furthers the historical purposes of punitive damages—punishment and deterrence. Thus, punitive damages are awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability."

325 Md. at 454, 601 A.2d at 649 (citations omitted). Any punitive damages that might be allowed in any recognized tort of breach of fiduciary duty, or in an action for accounting, would be controlled by the above-stated policy.

To the extent that Adams's argument is that a breach of fiduciary duty in and of itself permits the award of punitive damages, we reject his contention under the policy guidelines for punitive damages in general, as set forth in *Zenobia*. To the extent that Adams's argument is that the facts in the instant matter support a finding of evil motive, intent to injure, or fraud, we hold that the circuit court was not clearly erroneous in finding an absence of actual malice or fraud.

In a nutshell, Coates advantaged himself in the winding up of ADCO by making distributions to himself, without making equal distributions to Adams at the same time. These unilateral distributions were fully and accurately recorded on the books of the partnership and reflected by the parties' accountant in the financial statements and tax returns. The appendix to this opinion demonstrates that, although the distributions to Adams exceeded those to Coates in calendar 1985, Coates withdrew some $42,000 in 1986, resulting in a negative balance in his capital account. Under the evidence and inferences most favorable to Coates, as the prevailing party on the punitive damage issue, Adams periodically was furnished the financial data showing that Coates was overdrawn, and thereby indebted to Adams.

Further, there were at least two properties owned by the partners at the time of trial that had not been liquidated. Coates testified that, based on market values, one of these properties had an equity of approximately $30,000 while the other property, on which there was no mortgage, had a maximum market value of $30,000. If these partnership properties in fact were liquidated at approximately those values, Coates estimated that Adams would be fully paid and perhaps $2,000 would be distributed to Coates.

Coates flatly denied the misrepresentation attributed to him in Count V of Adams's counterclaim concerning the Jackson note. Adams emphasizes as proof of fraud that Coates, when deposed in this action, also denied receiving repayment of the Jackson mortgage. The circuit court found that Coates's denial under oath at deposition was contrary to the fact of receipt of some $16,000 from Jackson, but the circuit court did not find that the testimony was deliberately false. Rather, the court reasoned that "[e]ven were there some confusion on [Coates's] part, it was incumbent upon him to make that matter correct in the near future."

We do not condone Coates's inequitable conduct in handling aspects of the ADCO winding up. That breach of fiduciary

duty has been fully remedied.[7] By affirming the denial of punitive damages we hold simply that the circuit court was not clearly erroneous in finding a lack of evidence to support punitive damages. We intimate no opinion on whether, from the record as a whole, facts sufficient to support an award of punitive damages might be gleaned, had the trier of fact reached the opposite conclusion.

In any event, the trier of fact has discretion to deny punitive damages even where the record otherwise would support their award. *See Nast v. Lockett*, 312 Md. 343, 349, 539 A.2d 1113, 1116 (1988), *overruled on other grounds, Zenobia*, 325 Md. at 460, 601 A.2d at 652; *Dennis v. Baltimore Transit Co.*, 189 Md. 610, 616, 56 A.2d 813, 816 (1948) (citing *Sloan v. Edwards*, 61 Md. 89, 100 (1883)); Maryland Civil Pattern Jury Instructions 10:6(a), at 226 (1984) ("If you award plaintiff damages to compensate him for the actual ... [losses] he suffered, you may, *but are not required to*, award him an additional amount as punitive damages." (Emphasis added)).

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER, DAVID M. ADAMS.*

### APPENDIX
Partners' Capital Accounts

|  | Opening Capital | Capital Contribution | Ordinary Income (Loss) | Other Income (Loss) | Withdrawals and Distributions | Capital at End of Year |
|---|---|---|---|---|---|---|
| **1/1–12/31/85** |  |  |  |  |  |  |
| ADCO | 61,425.38* | — | 876.88 | 4,712.98 | 7,061.39 | 59,953.85 |
| Adams (K–1) | 30,712.69 | — | 438.44 | 2,356.49 | 5,869.35 | 27,638.27 |
| Coates (K–1) | 30,712.69 | — | 438.44 | 2,356.49 | 1,192.04 | 32,315.58 |
| **1/1–12/31/86** |  |  |  |  |  |  |
| ADCO | 59,953.85 | 343.80 | 5,119.29 | — | 42,867.31 | 22,549.63 |
| Adams (K–1) | 27,638.27 | 48.86 | 2,559.64 | — | 764.68 | 29,482.09 |
| Coates (K–1) | 32,315.58 | 294.94 | 2,559.65 | — | 42,102.63 | (6,932.46) |
| **1/1–12/31/87** |  |  |  |  |  |  |
| ADCO | 22,549.63 | — | (2,208.17) | (500.00) | 5,654.43 | 14,187.03 |

7. The way in which the judgment in favor of Adams fits into the overall winding up of ADCO is a question that is not before us and on which we intimate no opinion.

| | Opening Capital | Capital Contribution | Ordinary Income (Loss) | Other Income (Loss) | Withdrawals and Distributions | Capital at End of Year |
|---|---|---|---|---|---|---|
| Adams (K–1) | 29,482.09 | — | (1,104.08) | (250.00) | — | 28,128.01 |
| Coates (K–1) | (6,932.46) | — | (1,104.09) | (250.00) | 5,654.43 | (13,940.98) |
| 1/1–12/31/88 | | | | | | |
| ADCO | 9,008.00** | — | (806.40) | (400.00) | — | 7,801.60 |
| Adams (K–1) | 25,538.49 | — | (403.20) | (200.00) | — | 24,935.29 |
| Coates (K–1) | (16,530.49) | — | (403.20) | (200.00) | — | (17,133.69) |

\* Although the calendar 1985 partnership return shows an opening capital of $61,425.28, the opening capital must have been $.10 more given the partners' opening capital balances and the end of year capital balance after adding income and subtracting distributions.

\*\* The opening balance in the partners' capital account was reduced by $5,179.03 for reasons that are not obvious from examining the record extract.