**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0136

September Term, 2015

_____

1st TEAM FITNESS, LLC, et al.


v.


FRANCESCO ILLIANO


_____

Berger,
Reed,
Rodowsky, Lawrence F.
    (Retired, Specially Assigned),

          JJ.

_____

Opinion by Rodowsky, J.

_____

Filed:  June 1, 2016

Appellant, 1st Team Fitness, LLC (1st Team) brought this action, directly and derivatively, on behalf of Pozzuoli, LLC (Pozzuoli), against the appellee, Francesco Illiano (Illiano).[1]  Each of these parties was a fifty percent member in Pozzuoli.  On counts charging intentional misrepresentation-concealment or non-disclosure, constructive fraud, breach of contract and conversion-embezzlement, the Circuit Court for Carroll County, at a bench trial, awarded Pozzuoli, LLC (hereinafter sometimes called the Gym) compensatory damages of $527,831, of which $263,915 were awarded directly to 1st Team. Appellant is aggrieved because the circuit court did not award punitive damages or counsel fees or litigation expenses.

The circuit court also appointed a receiver for Pozzuoli, LLC.  By a separate brief, Pozzuoli, through its receiver, joins in requesting a reversal and remand on the punitive damages issue.

Illiano has cross-appealed and asserts that the circuit court abused its discretion in failing to find a discovery violation by 1st Team, arising out of its allegedly untimely disclosure of the opinion expressed by the accounting expert called by 1st Team at trial.

For the reasons hereinafter set forth, we shall affirm.

### Background Facts

Illiano, through BAIA, LLC, owned the premises located at 1311 South Main Street in Mt. Airy. In March 2009, Illiano, through his then solely owned LLC, Pozzuoli, acquired

---

[1]The Operating Agreement spells the name of the LLC "Pozzuoli." The preprinted checks for the LLC at Damascus Community Bank spell the name of the LLC "Pozzouli." We shall use the former spelling, as did the parties and the trial court.

a franchise from SNAP Fitness, Inc. (SNAP Fitness) to operate a SNAP fitness center on the lower level of those premises. The facility opened in September 2009. One Hundred Forty Thousand Dollars in startup costs were loaned to the Gym by Illiano from funds obtained from other business entities that he owned, wholly or partially. The Gym hired a manager and engaged Donald Caparotti (Don) and Diane Caparotti (Diane), who are husband and wife, to be fitness trainers. The Caparottis rendered those services through their LLC, 1st Team. It initially was paid 75% of the training fees with the remaining 25% retained by the Gym.

The original manager's services, however, proved unsatisfactory and, effective January 1, 2010, the Caparottis and Illiano entered into the agreement that underlies this litigation, namely, the operating agreement for Pozzuoli, LLC by and between Illiano and 1st Team. Its relevant features included:

- Illiano and 1st Team each had 50% interests in the Gym. The operating agreement recited initial cash capital contributions of $100 per member, but those amounts were not actually paid. 1st Team paid no monetary consideration for its 50% interest.

- Don and Diane would manage the fitness center, ordinarily working no less than a combined 50 hours per week, for which they would retain 100% of the personal training fees.

- Illiano would be the managing member. In his sole discretion, he would determine the amount of cash available for distribution.

2

- Illiano had "full, exclusive and complete discretion, power and authority in operating the [Gym's] business," including "determin[ing] the accounting methods and procedures of the [Gym]."

- Illiano was to "keep … full and true books of account, in which shall be entered fully and accurately each transaction of the [Gym]."

- The books of account were to be open to inspection by members during regular business hours and were to be available online if the Managing Member maintained the books in a manner allowing that access.

- There was no restriction on members engaging in other businesses and the Gym was unrestricted in dealing with businesses owned by or affiliated with a member.

- Each member had a right of first refusal in the event of a sale of the other member's interest.

- The members agreed that Illiano had loaned $140,000 to the Gym prior to the date of the Operating Agreement.

After several months of operations, the Caparottis began fielding complaints from vendors and employees that they had not been paid. Nor was the couple receiving payment for personal training. In April 2010, they first received financials for the Gym and thereafter received them sporadically. None of the reports had supporting details. After repeated requests for a meeting, the Caparottis met with Illiano in early 2011, but the same circumstances continued.

3

For some eighteen months after June 2011, 1st Team received no financials, despite repeated requests. Personal training fees were received only intermittently.

In November 2012, Illiano met with Don and Diane and advised that he was discussing selling the Gym to SNAP Fitness. The couple objected and asserted that they would exercise the right of first refusal that 1st Team had under the Operating Agreement. Illiano agreed that he would not sell and he broke off the negotiations.

On Sunday, March 3, 2013, Illiano asked Don to meet in the former's office. Illiano told Don that he had sold the Gym to SNAP Fitness. The circuit court found as a fact that Illiano told Don that "it's nothing personal, I can't afford to lose my empire."

### The "Empire"

English is not Illiano's first language. He testified with a "heavy accent."[2] Since coming to the Mt. Airy area, he has acquired numerous business interests. Interests held by Illiano as of January 1, 2010, were:

- BAIA, LLC, owning real estate assessed in excess of $13,000,000;

- Ridgewill, LLC, owning interests in two commercial properties that are leased;

- The Mt. Airy Inn, a restaurant;

- Napoli, Inc., a pizza restaurant;

- Lenanos, LLC, owning the Mt. Airy Green Turtle, a restaurant; and

- Germantown Green Turtle, a restaurant.

---

[2]The circuit court noted that "Pozzuoli is a city in the province of Naples."

Illiano has "silent partners" in BAIA, Lenanos, the Germantown Green Turtle and the Mt. Airy Inn, but he controls each of the companies.

Illiano views each component of the "empire" as a company owned by him. Illiano testified that if there were bills to be paid by one company, but it did not have cash to pay the bill, he would take the money from another company and put it back later. From a bookkeeping standpoint, this was recorded through an account that was added to the QuickBooks computerized accounting system utilized by the companies. That account was labeled "Due to/from Frank." The bookkeeper employed by Illiano Properties, which was the management corporation for the "empire," testified that there were twenty entities wholly or partially owned by Illiano. That witness also testified that she did not handle the intra-company transfers of funds and explained, "Frank would take care of those kinds of transactions himself." She would cut checks at his direction. The "Due to/from Frank" account had been used for at least ten years since the QuickBooks system was initiated.

### The Empire In Peril

On direct examination, Illiano had testified that the reason for the sale of the Gym was its lack of profitability. On cross-examination, he was impeached by certified copies of court records of creditors' suits against businesses in the empire. Illiano's lender, on February 14, 2013, entered a confessed judgment against him, his wife and various of his companies for roughly three-quarters of a million dollars. Illiano acknowledged that immediately after those judgments were entered, he contacted SNAP Fitness to sell the

5

Gym. He was also sued by at least one other bank. In addition, the federal and state governments imposed tax liens.[3]

### The Sale

The sale of the Gym closed Friday, March 1, 2013, pursuant to documents executed that day. It was a sale of the assets of Pozzuoli. The purchase price was $410,000. After deductions for the payoff of leases on equipment ($144,211.55) and for a holdback, Pozzuoli netted a total of $260,958.45 that was wired by SNAP Fitness to the Gym's account at Damascus Community Bank.

At the meeting between Illiano and Don on Sunday, March 3, following the sale, the former told the latter that one-half of the net proceeds from the sale, after expenses and liabilities, was approximately $55,000. Illiano requested that Don execute a release on behalf of 1st Team, before paying 1st Team's share of the net proceeds. Don refused, and the share was not paid.

After this matter was in litigation, Illiano produced four statements that purported to account for the $410,000 paid for the assets of Pozzuoli. In addition to the payoff of $144,211.55 on the equipment lease and holdback offsets of $4,830, the statements claimed expenses for legal fees, property taxes, a $63,667 balance on "Loan to Frank," reconciliations with the landlord (BAIA, LLC), a brokerage/consulting fee of 10% (to an Illiano company) and "unbilled" startup costs for the Gym claimed to have been paid by

---

[3]The record does not disclose against whom the liens were imposed. The claims were satisfied by July 2013.

6

Illiano Properties. The 1st Team share of the net, after expenses, per these statements, ranged from $61,352.76 to a loss of $21,407.16.

The damages theory adopted by the court did not require addressing the legal enforceability of these offsets, claimed by Illiano, against the amounts wired to Pozzuoli by SNAP Fitness, as we explain below.

**The Damages Calculation**

The Caparottis engaged a forensic accountant, Andrew Runge, to analyze the accounting for the sale proceeds. This ultimately led him to the "Due to/from Frank" bookkeeping account and to the Pozzuoli checking account at Damascus Community Bank. The buyer had wired $255,788.45 on March 1, 2013, to the Pozzuoli checking account. That same day, Pozzuoli purchased, for eight dollars, a Treasurer's check for $200,000 payable to BAIA, LLC. The net of $5,170 from the asset purchase holdback was wired to Pozzuoli's bank account no later than May 13, 2013. On May 30, 2013, a Treasurer's check was purchased from that account for $5,000, payable to "Illiano Property, Inc."

Mr. Runge analyzed the Pozzuoli checking account for the period beginning with 1st Team's acquisition of a 50% interest in the Gym, *i.e.*, from January 1, 2009. In the three years between March 2010 and March 2013, there were sixteen checks drawn, totaling $422,612, for which a Pozzuoli business purpose was not noted in the records. Of these, fifteen were payable to Damascus Community Bank, almost all of which were to purchase Treasurer's checks. The Treasurer's checks, in turn, were payable to entities in the "empire." Mr. Runge was "unclear as to why [Treasurer's checks] would be employed other than to potentially obviscate [obfuscate] the source of these funds."

7

Runge's analysis of the "Due to/from Frank" account on the books of Pozzuoli, for a comparable period, lists, in small, single-spaced print, over three 8½" pages, transactions that are classified as "Withdrawals" or "Infusions." There was a total of $567,949.97 in withdrawals. "[B]ased on what [he] was able to verify or look at," Runge opined that "that $567,949.97 went out of the account and there was not documentation provided to demonstrate that that was in fact a valid expense of Pozzuoli." Runge's analysis totaled the infusions at $282,702.04. These had been deposited to the Pozzuoli account "and looked like [they were] not revenue attributable to Pozzuoli." Runge also opined that additional credits against the excess of withdrawals over infusions should be given for one-half of Pozzuoli's net income shown on its tax returns for 2010-2012 and for the $140,000 agreed upon in the operating agreement statement as Illiano's startup loans. Thus, the net claim against Illiano on the transactions processed through the "Due to/from Frank" account on the books of Pozzuoli was $105,219.

Thus, the judgment awarded to 1st Team was $422,612 + $105,219 x l/2 = $263,915.

**The Fact Findings**

The circuit court decided this case in a fifty-two page opinion. It found that Illiano's "breaches and misrepresentations" included the following (exhibit references omitted):

"1)    Failure to keep and maintain full and true books of account;

"2)    Extreme mismanagement of company funds, books and records in violation of common law fiduciary duties;

"3)     Failure to provide 1st Team Fitness access to the Pozzuoli online QuickBooks account;

"4)      Failure to provide 1ˢᵗ Team Fitness access to the financial and accounting records of Pozzuoli, despite many repeated requests;

"5)      Failure to deposit or invest all Pozzuoli funds in the company name;

"6)      Taking $105,219 in excess withdrawals from the Pozzuoli bank account;

"7)      Causing $422,612 in funds to be removed from the Pozzuoli bank account, which transactions were not entered into the Pozzuoli accounting records;

"8)      Causing $422,612 in Pozzuoli funds to be deposited into not fewer than nine (9) other companies owned by Defendant, most of which Defendant testified had no business relationship with Pozzuoli LLC;

"9)      Intentionally commingling Pozzuoli funds with his other business entities;

"10)    Treating business funds as his own personal funds, including treating the Pozzuoli bank account as his own;

"11)    Failing to disclose his actions, much less seek majority or supermajority consent, with regard to the sale of the Pozzuoli assets to SNAP Corporate;

"12)    Causing all or substantially all of the Pozzuoli assets to be sold to SNAP Corporate;

"13)    Failing to disclose to SNAP Corporate during deal discussions of the existence of 1ˢᵗ Team Fitness as a member in Pozzuoli; (Defendant testified that he always treated 1ˢᵗ Team Fitness as a member and at his deposition, claimed he didn't realize 1ˢᵗ Team Fitness was not a member until the lawsuit was initiated, some four (4) months after [representing to SNAP] that he was the sole member);

"14)    Creating unsubstantiated expenses to be subtracted from the sale proceeds in an effort to increase his share of the proceeds;

"15)    Creating more unsubstantiated expenses to drive the Sales Price Less Expenses values down as the litigation continued;

9

"16)  Taking a guaranteed payment in the amount of $45,799 in 2011 not also paid to 1st Team Fitness;

"17)  Refusing to turn over any money from sales proceeds to 1st Team Fitness until the release was signed; (Defendant testified he did require the Caparottis to sign the release before he would give them any money from the sale);

"18)  Failing to pay any portion of the sales proceeds from the March 1, 2013 asset sale to 1st Team Fitness;

"19)  Causing substantially all of the sales proceeds from the asset sale to be transferred to his company BAIA, LLC;

"20)  Causing the sales proceeds to be further transferred from BAIA, LLC's bank account to eight (8) other entities owned by Defendant, most of which Defendant testified had no business relationship with Pozzuoli LLC."

Nevertheless, with respect to 1st Team's claim of fraud, in the sense of intentional misrepresentation, concealment or non-disclosure, the court found:

"The Court also concludes that, however ill-advised Illiano's actions were, Plaintiffs have not proven that they were done with the knowledge that the representations were false.  Rather, the Court concludes that Illiano acted under the woefully misguided belief that he or his entities were entitled to withdraw funds from Pozzuoli as he saw fit, that he was entitled to sell all of Pozzuoli's assets, and that he was further entitled to create expenses of sale to justify that which he believed would result in a proper distribution of the sale proceeds."

Specifically relating to its conclusion not to award any punitive damages, the court explained:

"The  Court declines to find that Illiano acted with actual malice, and thus declines to award punitive damages in this case.  A party seeking punitive damages must prove actual malice by clear and convincing evidence. *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md. App. 18, 43-[5]3[, 818 A.2d 1159, 1173-1179] (2003), *aff'd.*, 379 Md. 249[, 841 A.2d 828] (2004).  An award of punitive damages must be based upon actual malice, in the sense of evil or wrongful motive, intent to injure, ill will, or fraud. *Tierce*

10

*Md., Inc. v. Williams*, 381 Md. 378, 849 A.2d 504 (2004). A breach of fiduciary duty alone does not establish actual malice. *Bresnahan v. Bresnahan*, 115 Md. App. 226, 693 A.2d 1 (1997).

"It is true that the Court found that Illiano breached his fiduciary duty to Plaintiffs, and that such breach of fiduciary duty constituted intentional misrepresentation toward the Plaintiffs. Those findings alone are not sufficient to support a claim for punitive damages. A finding of fraud or deceit based on a defendant's <u>actual knowledge</u> that his representations were false coupled with an intent to deceive can and normally will justify an award of punitive damages. *Ellerin* [*v. Fairfax Sav., F.S.B.*, 337 Md. 216,] 240-41[, 652 A.2d 1117, 1129 (1995)]. However, where a defendant's fraud or deceit is premised not on his actual knowledge o[f] falsity, but on his reckless disregard or indifference as to the truth of his representations, punitive damages are generally not recoverable. *Id.*, at 235[, 652 A.2d at 1126]. Similarly, other conduct, recognized by the law and sometimes labeled 'fraud,' falls short of the act of deliberate deception required for actual malice in this context, and is not sufficient to sustain a punitive damages award. [*Id.*] at 235-36[, 652 A.2d at 1126]. For example while 'constructive fraud' has been recognized for certain purposes in Maryland, it does not necessarily involve the type of dishonest or immoral conduct that is required to support an award of punitive damages. *Id.*

"As indicated above, the Court finds that Illiano's actions, while done with an intent to deceive, where carried out with reckless indifference to and not actual knowledge that his representations were false. Accordingly, the Court declines to award punitive damages to the Plaintiffs."

Additional facts will be set forth in the discussion of particular issues.

## Questions Presented

Appellant, 1st Team, asks:

"I. Did the Circuit Court commit error by holding the record did not support a finding of actual malice?

"II. Did the Circuit Court commit error by failing to award attorneys' fees under the common fund doctrine?"

Appellant Pozzuoli asks if the court applied the correct legal standard for awarding punitive damages.

On his cross-appeal, Illiano asks:

"Did the trial court abuse its discretion in refusing a continuance and allowing the testimony of the Appellant's expert to opinions which were never disclosed in pre-trial discovery?"

## DISCUSSION

### I

Appellants seek a remand, with directions to hold a hearing on, *inter alia*, punitive damages. 1st Team's argument focuses on two counts of the complaint, Count IX, Conversion/Embezzlement, and Count VI, Breach of Fiduciary Duty. As to Count IX, the court found that "Illiano's actions, while done with an intent to deceive, [were] carried out with reckless indifference to and not actual knowledge that his representations were false."[4]

On the alleged claim for breach of fiduciary duty, as Count VI was labeled, the court held, citing *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997), that that claim did not constitute a stand-alone cause of action, at least where only monetary damages were sought as the remedy. Thus, no damages, compensatory or punitive, were awarded on that count.

There must be an award of compensatory damages, however, on each count that is sought to be the basis for an award of punitive damages. *See Caldor, Inc. v. Bowden*, 330 Md. 632, 662-63, 625 A.2d 959, 973-74 (1993); *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 340 A.2d 705 (1975); *Potomac Elec. Power Co. v. Smith*, 79 Md. App. 591, 639-40, 558 A.2d 768, 792-93 (1989) (holding that award of funeral expenses in personal

---

[4]The court incorporated the reasons (extensively quoted above) that it had expressed for denying punitive damages on Count III, "Intentional Misrepresentations, Concealment or Non-Disclosure," and on Count IV, "Constructive Fraud," as reasons for denying punitive damages on Count IX.

12

representative's action satisfied the compensatory damage predicate for a punitive damage award on survival claim), *overruled on other grounds by United States v. Streidel*, 329 Md. 533, 620 A.2d 905 (1993). Consequently, we consider only appellant's argument based on the conversion claim.

The principles controlling the award of punitive damages were set forth in *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), where the Court said:

> "'[T]he purposes of punitive damages relate entirely to the nature of the defendant's conduct.' *Schaefer v. Miller,* 322 Md. [297,] 321, 587 A.2d [491,] 503 [(1990)]. Whether the tort occurred before or after the formation of a contractual relationship should not determine whether actual or implied malice is required for allowing an award of punitive damages. Rather, the availability of a punitive damages award ought to depend upon the heinous nature of the defendant's tortious conduct.
>
> "Awarding punitive damages based upon the heinous nature of the defendant's tortious conduct furthers the historical purposes of punitive damages – punishment and deterrence. Thus, punitive damages are awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability."

*Id.* at 454, 601 A.2d at 649-50 (citations omitted).

> The Court also addressed the standard of proof.
>
> "Use of a clear and convincing standard of proof will help to insure that punitive damages are properly awarded. We hold that this heightened standard is appropriate in the assessment of punitive damages because of their penal nature and potential for debilitating harm. Consequently, in *any* tort case a plaintiff must establish by clear and convincing evidence[,] the basis for an award of punitive damages."

*Id.* at 469, 601 A.2d at 657.

In *Scott v. Jenkins*, 345 Md. 21, 690 A.2d 1000 (1997), Judge Karwacki, writing for the Court some five years after *Zenobia*, in a case in which punitive damages were awarded

13

by a jury that found the defendant liable for battery and false imprisonment, said: "Lest there be any remaining doubt, in order to recover punitive damages in *any* tort action in the State of Maryland, facts sufficient to show *actual malice* must be pleaded and proven by clear and convincing evidence." 345 Md. at 29, 690 A.2d at 1004. The punitive damage award in that case was stricken for failure to have plead sufficient facts.

1st Team's argument emphasizes that the court's finding of Illiano's liability for conversion included the net proceeds of the sale. There was no contract authorizing a ten percent broker's fee as a cost of sale and no documentation for certain other charges. The court found that "[b]y creating false expenses, Illiano intentionally appropriated the sales proceeds and paid them to himself or nine (9) of his other business entities."

Illiano refers us to the litigation culminating in *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 841 A.2d 828 (2004), a conversion case tried to a jury, in which an award of punitive damages was affirmed. There, the Court said, "Where the defendant converts property with a consciousness of the wrongfulness of that conversion, he or she possesses the requisite improper motive to justify the imposition of punitive damages." *Id.* at 266, 841 A.2d at 838. But, in *Beall v. Holloway-Johnson*, 446 Md. 48, 72, 130 A.3d 406, 420 (2016), the Court said, "Reliance on an embedded 'malice implicit' in the elements of the intentional torts of the battery and Article 24 violations claims pushes our jurisprudence on punitive damages too far." And further:

> "Because we have restricted punitive damage awards to cases where the conduct is 'characterized by knowing and deliberate wrongdoing,' a standard of 'malice implicit' would expose inappropriately defendants to punitive damages without requiring a plaintiff to prove actual malice and the required specific intent to injure by clear and convincing evidence."

14

*Id.* at 73, 130 A.3d at 420. This rationale applies to the intent satisfying a *prima facie* case of conversion.

Even if we assume, *arguendo*, that the record in this case was sufficient to permit a trier of fact to find the requisite improper motive "to support awarding punitive damages," the trier of fact did not award punitive damages. In his exposition for this Court on inferred malice in conversion cases, *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md. App. 18, 818 A.2d 1159 (2003), Judge Moylan explained that "the circumstances surrounding the conversion and the manner in which it was committed frequently provide a factual predicate from which actual malice can be, *though it need not be*, inferred." *Id.* at 34, 818 A.2d at 1168 (emphasis added).

The Court of Appeals relied upon the same principle as an alternative ground of decision in *Adams v. Coates*, 331 Md. 1, 626 A.2d 36 (1993). That case presented what was in essence an action for accounting between partners. The Court, assuming that breach of fiduciary duty could be treated as a tort that could be the springboard for punitive damages, held:

> "In any event, the trier of fact has discretion to deny punitive damages even where the record otherwise would support their award. *See Nast v. Lockett*, 312 Md. 343, 349, 539 A.2d 1113, 1116 (1988), *overruled on other grounds*, *Zenobia*, 325 Md. at 460, 601 A.2d at 652; *Dennis v. Baltimore Transit Co.*, 189 Md. 610, 616, 56 A.2d 813, 816 (1948) (citing *Sloan v. Edwards*, 61 Md. 89, 100 (1883)); Maryland Civil Pattern Jury Instructions 10:6(a), at 226 (1984) ('If you award plaintiff damages to compensate him for the actual … [losses] he suffered, you may, *but are not required to*, award him an additional amount as punitive damages.' (Emphasis added))."

*Id.* at 15, 626 A.2d at 43.

15

The *Darcars Motors* litigation also made plain that, even if the case for punitive damages may be considered by the trier of fact, the trier of fact must be convinced to the level of clear and convincing persuasion that actual malice motivated the tort.   379 Md. at 267, 841 A.2d at 839.   "As a function of persuasion, the juror must feel that the circumstances of the tort were so egregious or the motivation of the tortfeasor so outrageous as to call for the sterner sanction." *Holloway-Johnson v. Beall*, 220 Md. App. 195, 223, 103 A.3d 730, 739 (2014), *aff'd in part and rev. in part on other grounds*, 446 Md. 48, 130 A.3d 406 (2016). Here, 1st Team was unable to convince the trier of fact to that level of persuasion.

The receiver for Pozzuoli attempts to cast an entirely different light on the record. That appellant's position is that the court committed an error of law.  The argument is that the fifty-plus page opinion erroneously explains why the court could not award punitive damages, even though the court may have been desperately straining to do so.  The court's opinion undercuts the receiver's position.   The portion of the opinion that directly addresses punitive damages opens:  "The Court declines to find that Illiano acted with actual malice[.]" To "decline" connotes the rejection of that which is offered or available. Further, the court cited to *Darcars Motors* from both appellate courts, so the court was well aware that its ultimate verdict must be by clear and convincing persuasion.   But, as the court fully explained, it was not persuaded that Illiano acted with actual malice.

We note, moreover, that there was evidence tending to prove that Illiano's conversion of 1st Team's property was not motivated by actual malice against it, Don or Diane.  Don testified that, at the March 3, 2013 meeting, Illiano told him that the sale of

16

the Gym assets was "nothing personal" but was done to save the "empire." In addition, Illiano offered $55,000 in payment of 1st Team's share of the net proceeds, upon execution of a release, but Don declined. It was only after the relationship was in litigation that Illiano began asserting setoffs. Even then, the four accountings of the net sale proceeds consistently presented a $63,667 item, labeled, "Balance on Loan to Frank," as a setoff against 1st Team's share. Illiano explained that that setoff was the balance, after partial payments by Pozzuoli of $76,333, on the $140,000 loan by (or through) Illiano to start the Gym. Thus, the argument that the four accountings present spurious setoffs and thereby evil motive is ambiguous.[5]

There was no error or abuse of discretion in the court's declining to award punitive damages.

## II

Ordinarily, under the "American rule" on attorney's fees, each party pays its own counsel fees and expenses. *Accubid Excavation, Inc. v. Kennedy Contractors, Inc.*, 188 Md. App. 214, 230, 981 A.2d 727, 737 (2009). 1st Team's other contention, however, is that the legal fees and litigation expenses incurred by it should be paid out of the common

---

[5]Runge's damage calculation, accepted by the court, credited the entire $140,000 startup loan, agreed upon in the Operating Agreement, in favor of Illiano against the excess of the withdrawals over infusions in the "Due to/from Frank Account." This does
   [5](cont'd.)
not mean that the judgment should be increased by $76,333. Runge listed as "withdrawals" items that he could not relate to a Pozzuoli business purpose. Presumably, the part payments on the $140,000 loan are included in the total withdrawals of $567,949.97. If 1st Team's expert had identified the purpose of the part payments, he would have reduced the $140,000 credit and not treated the loan as unpaid in its entirety.

17

fund created by the litigation. Dobbs, LAW OF REMEDIES, § 3.10(2), at 393 (1993), explains the common fund rule:

> "When a prevailing plaintiff's litigation produces or preserves a fund in which others share, those who share in the fund must share as well in the cost of producing it. They are therefore responsible for a proportionate part of the attorney fee and other reasonable costs of the litigation. This burden is imposed by deducting the fee from the fund itself and then distributing the fund to those entitled to it."

(Footnote omitted).

The issue arises procedurally out of the following facts. 1st Team sued in its own right and derivatively on behalf of Pozzuoli. In its written closing argument, 1st Team submitted:

> "Plaintiffs request[, *inter alia*,] this Court enter judgment as follows: (1) compensatory damages in the amount of $527,831, entered against Defendant and in favor of Pozzuoli, LLC, AND half of that amount, $263,915, awarded against Defendant and in favor of 1st Team Fitness, LLC; [and] attorneys' fees based upon 1st Team Fitness, LLC's derivative actions on behalf of Pozzuoli, LLC under the common-fund doctrine, amount to be determined upon further application to this court[.]"

Illiano did not respond to the attorneys' fee issue because the court had stated that it would reserve on those issues "until after it had decided the substantive claims."

The court ordered that judgment be entered in favor of the "Plaintiffs" and awarded compensatory damages "to the Plaintiff, Pozzuoli, LLC in the amount of $527,831, and half of that amount, $263,915 is awarded against Defendant and in favor of 1st Team Fitness, LLC."[6] One interpretation of the court's order is that 1st Team could proceed either

---

[6]The docket entry records that the judgment is for $527,831 and is in favor of both Pozzuoli and 1st Team.

18

under a derivative judgment or a direct judgment.[7]  The order did not mention counsel fees but stated that "any other relief not expressly granted herein is denied." 1st Team sought reconsideration, which was denied.  Appellant also sought the appointment of a receiver, which was granted.

These two motions by 1st Team reveal that there were no assets of Pozzuoli to be administered; thus, no bond was required. 1st Team requested "that the receiver be directed to compensate Plaintiff 1st Team Fitness, on a priority basis, only behind the administrative claim of the receiver himself, for costs and attorneys' fees expended to obtain the award." These fees would be paid from "any funds recovered by the receiver for the estate of Pozzuoli as a result of the legal efforts … to obtain the award derivatively on behalf of Pozzuoli LLC."

In other words, 1st Team wants to pass through Pozzuoli all of the payments on the judgment, to the full principal amount of $527,831.  Because 1st Team has opted to act

---

[7]A direct action is one brought by a shareholder "against alleged corporate wrongdoers when the shareholder suffers the harm directly or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation." *Shenker v. Laureate Education, Inc.*, 411 Md. 317, 345, 983 A.2d 408, 424 (2009).

Illiano's failure to distribute to 1st Team its share of the proceeds of the unilateral sale of assets seemingly is an illustration of a direct injury. *See Shenker*, 411 Md. at 346-47, 983 A.2d at 425.

"One advantage a derivative action has for the shareholder is that the expenses of the litigation, if successful, may be borne by the corporation, not the shareholder: 'In direct, as opposed to derivative actions, each side will normally be responsible for its own legal expenses.'" *Boland v. Boland*, 423 Md. 296, 317, 31 A.3d 529, 542 (2011) (quoting W.M. Fletcher, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 5938 (2009 Rev. Vol.)).

19

under the derivative alternative of the order for judgment, presumably the contention is that 100% of the fee is to be deducted from the collections for Pozzuoli before any distribution would be made to 1st Team and before Illiano could assert that the distribution to him is a wash, because he would be the source of the funds and would be paying himself.

1st Team's gambit is not an appropriate use of the common fund exception to the American rule. The common fund exception "awards expenses when a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as the plaintiff." W.M. Fletcher, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 6045, at 312 (2004 rev. ed). The rule "is grounded in restitutionary considerations. Those who share the fund would be unjustly enriched if they could take the benefit without the burden." Dobbs, LAWS OF REMEDIES, § 3.10(2), at 395 (1993).

Here, this litigation resulted in a liability, not a benefit to Illiano. Nor can the result be viewed as a benefit to Pozzuoli in which Illiano would share. Pozzuoli is defunct. It has no assets. 1st Team does not propose to use any recovery from Illiano to reinvest it in Pozzuoli and revive the Gym.

Unlike a case in which a third party is the source of the fund, here the fund is the result of Illiano's liability. Certainly with respect to the counsel fee, to which 1st Team would accord priority in distribution, the two members of Pozzuoli are not a class that receives the same benefit. 1st Team would have its share of the fee and expenses incurred by the attorneys whom it engaged paid by Illiano, its adversary, through the conduit of the receivership. But, Illiano is subject to the American rule on counsel fees.

20

Nor are the members of the supposed class treated the same with respect to the distribution to members. Assume that y = the derivative judgment principal amount of $527,831, plus post judgment interest; and x = the allowed amount of counsel fees and costs. Then: $(y - x) \div 2$ = the theoretical distribution to each member of Pozzuoli. But, 1st Team would receive its distribution in cash, paid by Illiano, while Illiano would not receive any cash distribution, because he would be the source of the cash to begin with.

Professor Dobbs succinctly dispatches 1st Team's contention, stating:

> "Recovery of fees under the common fund rule is special because it is a recovery against allies, not adversaries. It is not fee shifting but fee sharing."

Dobbs, *supra*, § 3.10(2), at 393.

1st Team refers us to *Davis v. Gemmell*, 73 Md. 530, 21 A. 712 (1891), for the proposition that the common fund rule can apply where a shareholder suffers a detriment, namely, restoring to the corporation an asset wrongly diverted by him. *Davis* is distinguishable from the instant matter, because the corporation continued in business, all of the shareholders, including the disloyal officer who had appropriated a corporate opportunity, shared equally in the benefit of the recovery, and, under the peculiar facts of that case, the fee was for counsel engaged by the disloyal officer.

In *Davis,* North Branch Company operated a coal mine. It had three shareholders, William A. Brydon, the majority owner, Thomas Gemmell, and Malcolm Sinclair. Brydon, for his own account, sold $75,000 worth of coal to the Baltimore & Ohio Railroad Co. He had to sue to obtain a judgment for that amount, which he assigned to Henry G. Davis & Co. The minority shareholders in North Branch then sued, contending that the judgment

21

belonged to North Branch, and seeking other relief. The B & O paid the money into court. After an appeal that sustained an injunction, *Davis v. Gemmell*, 70 Md. 356, 17 A. 259 (1889), the minority shareholders amended their complaint to request, *inter alia*, that a receiver be appointed and North Branch be wound up. The defendants, Brydon and Henry G. Davis & Co., as well as the corporation, North Branch, "vigorously resisted the appointment of a receiver and the winding up of the corporation." *Davis v. Gemmell*, 73 Md. at 535, 21 A. at 713. The circuit court found that the judgment was North Branch's property and referred the matter to an auditor to state an account distributing the amount of the judgment. The Court declined to order dissolution.

The attorneys who had represented Brydon in the original litigation were allowed a fee out of the fund. The Court reasoned that the minority "stood by and saw the work done, … and they cannot now be heard in a court of equity to except to that work being paid for out of the fund realized by the labor of these gentlemen, especially when they themselves, these exceptants, are seeking to reap the benefit of that very work and labor." *Id.* at 540, 21 A. at 715.

After addressing the claims of other creditors of North Branch, the Court directed that the balance "belongs to the stockholders of the North Branch Company, and must be audited to them ratably, according to their respective holdings of the stock of the company." *Id.* at 552, 21 A. at 718. Thus, Brydon shared in the net recovery in proportion to his stockholdings in North Branch.

Unlike in *Davis*, it is unclear how Illiano could derive any benefit from the funds procured by 1st Team on behalf of Pozzuoli – a company with no assets and no ongoing

22

operations. The award is purely a liability insofar as Illiano is concerned. Consequently, in the case before us the common fund theory is not available.

### III

Illiano's cross-appeal focuses on the "off-the-books" component of the damage calculation.[8]  He says that 1st Team's expert's opinion at trial should have been limited to a figure opined by that witness at his deposition.  On deposition, Runge said that 1st Team's share of the net proceeds of sale should have been roughly $190,000.[9] Illiano compares $190,000 to the half of $422,612 that Runge used at trial in his damage calculation of the off-the-books transactions. Illiano says that there was a discovery violation because 1st Team did not supplement its discovery and that he was prejudiced thereby.  His requested relief is a remand and further proceedings.

The trial was conducted on four days, October 27 through October 30, 2014. On the second day of trial, Runge began his testimony. On direct, 1st Team introduced Exhibit 127, a list of checks drawn on the Pozzuoli account, payable to Damascus Community Bank, and totaling $422,612. Runge explained that he had asked for source documentation but had not received "source documentation that would allow [him] to determine what they were actually for and if they were in fact for valid expenses of Pozzuoli LLC." There was no objection to Exhibit 127 or to this testimony. Fifty-seven pages of transcript later, on

---

[8]It is the component other than the net of withdrawals over infusions in the "Due to/from Frank" account.

[9]Runge's deposition is not in the record extract.  Portions are referred to in Illiano's post-trial written argument.

the third page of Runge's cross-examination, he testified "that what [he] believe[d] that what [1st Team] would be entitled to from the sale *is in* what I have opined about which is *the off book transactions*." (Emphasis added). Illiano then asked for a continuance, claiming surprise because, on deposition, Runge had testified $190,000 was due 1st Team from the proceeds of sale. 1st Team explained that the sale proceeds had been included in a list of off-the-books checks that had been presented as early as June 2014 at a show cause hearing. Illiano said that that list contained checks written after the Gym had closed.

The court refused a continuance and directed that cross-examination proceed. It ruled that "if the Court believes at the conclusion of Mr. Runge's testimony that the Court should limit his opinions to those which were given in his deposition then I will make a determination that that time." The plaintiff's case concluded on the third trial day with the balance of Runge's testimony. Illiano did not move to limit Runge's damage figure.

Illiano presented the alleged discovery violation in his written post-trial argument. The Court did not explicitly address limiting Runge's evidence and thereby rejected it, per the last paragraph of its order.

Runge's deposition had been taken July 14, 2014. Quoted in Illiano's post-trial argument in the circuit court is the question put to Runge on deposition that produced the response on which the discovery violation argument rests. Counsel asked: "'If the trial in this case were to occur *today*, what is the amount that you contend *is owed* to the Caparottis?'" (Emphasis added).

There is no discovery violation. Runge was deposed about one month before 1st Team took the deposition of a representative of Damascus Community Bank. Documents

24

produced by the bank revealed that the checks payable to the bank were used to buy Treasurer's checks made payable to various entities in the "empire." At trial, Runge explained, "And now, looking at all of this, with all these company transfers, now you need to go back to each one of these individual companies." "[Y]ou're still stymied because you have to go further and further." The expert was also waiting for the source documents from Illiano that would explain the legitimacy of the off book transactions. He said "documents were not turned over until a week before trial, a couple of days before trial." But, he "never received the source documents."

Even if there were a discovery violation, there is no prejudice to Illiano. Runge tacked into the accounting engagement from the standpoint of investigating the distribution due to Pozzuoli members from the sale proceeds. At trial, he presented those proceeds as part of the larger claim involving disbursements that were paid to Damascus Community Bank without recording in the books of Pozzuoli any purpose, much less one related to that LLC.

There was no surprise or sandbagging. A listing of Pozzuoli checks to Damascus Community Bank was furnished by 1st Team in discovery (Bates No. "Fitness 1765"). 1st Team represents, without contradiction, that that list was produced at a show cause hearing held on June 5, 2014, apparently on alleged discovery violations. That list (Ex. 66 at trial) totaled $451,910.50.[10]

---

[10]Illiano used the Pozzuoli checking account for transactions after the holdback of the sales proceeds had been deposited and disbursed.

25

A listing of Pozzuoli checks to Damascus Community Bank was also produced by 1st Team (Ex. 67 at trial) at Runge's deposition on July 14, 2004. That listing totaled $558,958.50 (and included checks written to Damascus as late as January 9, 2014).

At trial, 1st Team *reduced* the claim on unsubstantiated disbursements to the bank to $422,612, principally by eliminating a number of checks dated March 2013 and later from the earlier lists (Ex. 127 at trial).

There is no difference, as a matter of Illiano's liability, between unsubstantiated disbursements from Pozzuoli recorded in the books of the LLC as "Due to/from Frank" and unsubstantiated disbursements from Pozzuoli to Damascus Community Bank. The former disappeared somewhere into the "empire" while, in the latter form of disbursement, we know which province of the "empire" was the destination of each Treasurer's check. Neither type of transaction informed the court on the business purpose, *vis-à-vis* Pozzuoli. Illiano could hardly have been prejudiced by 1st Team's treating, at trial, the "off-the-books" checks as subject to the same legal principles as the "Due to/from Frank" entries.

For all these reasons, we affirm all appeals.

**JUDGMENTS OF THE CIRCUIT COURT FOR CARROLL COUNTY ON THE APPEALS OF 1ST TEAM FITNESS, LLC AND OF THE RECEIVER FOR POZZUOLI, LLC, AFFIRMED.**

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY ON THE CROSS-APPEAL OF FRANCESCO ILLIANO AFFIRMED.**

**COSTS TO BE PAID 2/3 BY THE APPELLANTS AND 1/3 BY THE CROSS-APPELLANT.**